DISTRICT OF OREGON
**FILED**

**December 16, 2025**

**Clerk, U.S. Bankruptcy Court**

Below is an opinion of the court.

*Teresa H. Pearson*
_____
TERESA H. PEARSON
U.S. Bankruptcy Judge

## UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In re | Case No. 24-61379-thp7 |
| Juan Jose Barba, III, | |
| Debtor. | |
| Corvallis Custom, LLC, an Oregon domestic limited liability company, | Adv. Proc. No. 24-06064-thp |
| Plaintiff, | MEMORANDUM DECISION[1] |
| v. | |
| Juan Jose Barba, III, an individual and in his capacity as Owner of Brands and Logos, | |
| Defendant. | |

### Introduction

Plaintiff Corvallis Custom, LLC, asserts in this adversary proceeding that its former general manager, defendant Juan Jose Barba, III (also known as Johnny Barba or Johnny Wokhart) wrongfully took services, property, and trade information from Corvallis Custom and

---

[1] This disposition is specific to this case. It may be cited for whatever persuasive value it may have.

that the debts arising from that taking should be nondischargeable in bankruptcy.  Mr. Barba concedes that, at most, a small amount is owed and non-dischargeable but generally denies Corvallis Custom's allegations.

The court held a nine-day trial.  Plaintiff appeared through its counsel Timothy I. Crawley.  Defendant appeared through his counsel Douglas R. Ricks and Joshua G. Flood.

For the reasons set forth below, this court finds in favor of Corvallis Custom.  Mr. Barba intentionally engaged in a fraudulent scheme to divert information, products, and services from Corvallis Custom to its competitor, Brands and Logos, for his own personal benefit.  In the process, Mr. Barba stole product and computer files, falsified computerized documents, provided unauthorized free work, diverted customers, and engaged in threatening and defamatory conduct.  Mr. Barba's actions violated his non-compete and nondisclosure agreements with Corvallis Custom but were no mere breaches of contract—these breaches were accompanied by torts of embezzlement, larceny, fraud, and violations of Oregon's trade secrets law.

## Procedural History

Mr. Barba filed his voluntary chapter 7 case on June 14, 2024.[2]  Corvallis Custom timely filed this adversary proceeding, asserting claims under 11 U.S.C. §§ 523(a)(2), (a)(4), and (a)(6) and objecting to debtor's discharge under 11 U.S.C. §§ 727(a)(2), (a)(4), and (a)(5), and requested the trustee determine the potential for denial of discharge pursuant to 11 U.S.C. § 727(c), (d), and/or (e).[3]  After Mr. Barba filed a motion to dismiss,[4] the court granted Corvallis Custom leave to file an amended complaint asserting claims under Section 523(a)(2), (a)(4), and (a)(6), and under Section 727(a)(4) and (a)(5), if appropriate.[5]  Corvallis Custom timely filed its amended complaint asserting claims under 11 U.S.C. §§ 523(a)(2), (a)(4), and (a)(6).[6]

---

[2] ECF No. 1, filed in case no. 24-61379-thp7 on June 14, 2024.
[3] ECF No. 1, filed Sept. 17, 2024.
[4] ECF No. 9, filed Oct. 25, 2024.
[5] ECF No. 15, entered Nov. 20, 2024.
[6] Amended Adversary Complaint Objecting to Entry of Discharge Pursuant to 11 U.S.C. §§ 523(a)(2)(A), (a)(4), and (a)(6) (the "Amended Complaint").  ECF No. 19, filed Dec. 3, 2024. Notwithstanding the title in the caption, the Amended Complaint asserts claims under both section 523(a)(2)(A) and 523(a)(2)(B), as well as claims under section 523(a)(4) and 523(a)(6). Corvallis Custom dropped any claims under 11 U.S.C. § 727.

Mr. Barba filed his answer denying most of plaintiffs' factual allegations and asserting affirmative defenses of failure to state a claim, illegality, failure to form a contract, failure to mitigate, fault of others, and Corvallis Custom's disclosure of alleged trade secrets.[7]

Before trial Mr. Barba filed a motion for partial summary judgment,[8] asserting that (a) the Non-Compete agreement between Corvallis Custom and Mr. Barba is void and unenforceable under Oregon law, (b) the Non-Compete agreement could not be the basis for fraud or proving the false representation element of any of Corvallis Custom's claims, (c) Mr. Barba did not make false statements respecting the debtor or an insider of the debtor, (d) Mr. Barba was not a fiduciary of Corvallis Custom, and (e) Corvallis Custom's damages for changing invoices must be limited to the amount already awarded in a state criminal restitution judgment.[9]  Corvallis Custom opposed this motion.[10]

The court granted partial summary judgment to Mr. Barba with respect to Corvallis Custom's claim for defalcation in a fiduciary capacity under 11 U.S.C. § 523(a)(4) because Corvallis Custom could not show facts to support the existence of an express, statutory, or technical trust.[11]  The court denied the remainder of the Mr. Barba's motion for partial summary judgment.[12]  The court held that the Non-Compete agreement included a severability clause that could allow the court to find that the Non-Compete agreement was enforceable while Mr. Barba was employed by Corvallis Custom, but unenforceable to preclude Mr. Barba from working for a competitor after he was no longer employed by Corvallis Custom.

---

[7] Answer and Affirmative Defenses, ECF No. 20, filed Dec. 18, 2024.

[8] ECF No. 56, filed Sept. 19, 2025.

[9] *Id.*

[10] Plaintiff Corvallis Custom, LLC's Opposition Response to Defendant Juan J. Barba III's Motion for Partial Summary Judgment, ECF No. 75, filed Oct. 3, 2025.

[11] For a debtor to be a fiduciary for the purposes of section 523(a)(4) the fiduciary relationship must arise from an express, statutory, or technical trust that exists before the alleged defalcation and without reference to the alleged wrongdoing that caused the debt.  *Lewis v. Scott (In re Lewis)*, 97 F.3d 1182, 1185 (9th Cir. 1996).  The court did not grant summary judgment on claims for embezzlement or larceny under 11 U.S.C. § 523(a)(4).

[12] Record of Proceeding, ECF No. 92, filed Oct. 9, 2025; Order on Defendant's Motion for Partial Summary Judgment, ECF No. 135, entered Nov. 7, 2025.

The court held trial in this adversary proceeding on October 14-17, 27, 29-31, and November 3, 2025.  Eleven witnesses testified at trial:  Hogan Arey, Juan Jose Barba, III, Jason Trevon Butler, Rene Camacho, Lori Dollar, Lucas Escanlar, Jesse Freeby, Rebecca Freeby, Shaun Knowlton, Steven McCoy, and Taylor Westbrook.[13]

The following exhibits were admitted at trial:  Exhibits 1, 2, 3a, 3b, 3c, 3d, 3f, 3g, 3h, 3i, 3j, 3k, 3l, 3m, 3n, 3o, 3p, 3q, 3r, 3s, 3t, 3u, 3v (pages 1-6), 3w, 3x, 3y, 3z, 3aa, 3cc (except for the bullet point conclusions), 4, 5, 6a, 6b, 7, 8, 9, 12, 14, 15, 16, 17, 18, 19, 23, 26, 31, 32, 35, 36, 37, 38, 40, 41, 47, 48, 52, 54, 55, 56, 57, 58, 59, 60, 63, 64, 66, 70, 72, 73, 74, 75, 76, 77, 95, 100, 101, 102, 103, 104, 105, 106, 107, 109, 112, 113, 114, 116, 117, 118, 119, 120 (except page 26), 123, 124, 125, 134, 135, 145, 147, 148, 155, 156, 157, 158, B, C, D, and E.  At Corvallis Custom's request, the court took judicial notice of Exhibits 45, 49, 139, and 140.[14]

After the conclusion of Corvallis Custom's case in chief, the court heard Mr. Barba's motions for judgment as a matter of law on October 22, 2025.[15]  Mr. Barba asserted Corvallis Custom waived any arguments regarding breach of contract in its trial memorandum,[16] but the court disagreed.  The court concluded that Corvallis Custom's comments in its trial memorandum were not a voluntary relinquishment of a known right given Corvallis Custom's

---

[13] The court excluded testimony from Mr. Barba's proposed witness Hope Anderson because he did not include Ms. Anderson on his witness list as required by the Order re Scheduling, Application of FRCP 26, Trial Date, and Procedures, ECF No. 22, entered Dec. 19, 2024, and Fed. R. Civ. P. 26(a)(3)(A)(i), made applicable by Fed. R. Bankr. P. 7026.  Based on Mr. Barba's proffer of her testimony, Ms. Anderson's testimony would not have been solely for the purpose of impeachment, but for one of Mr. Barba's primary lines of defense, and transcripts in the record show that the substantive topics of her proffered testimony were addressed in depositions during discovery in this case, such that Mr. Barba should not have been surprised by the need for her testimony.

[14] Although plaintiff initially requested it, the court did not take judicial notice of Exhibits 141, 142, 143, and 144.  Exhibit 141, 142, and 144 were excluded because of ORS 137.109.  Exhibit 143 is a duplicate of Exhibit 119, which was otherwise admitted.

[15] Mr. Barba originally made these motions pursuant to Fed. R. Civ. P. 50, made applicable by Fed. R. Bankr. P. 9015(c).  Defendant's Memorandum in Support of Motion for Judgment as a Matter of Law, ECF No. 114, filed Oct. 22, 2025, p. 1.  The court held those rules inapplicable because this was not a jury trial.  Mr. Barba then orally moved to have the same matters considered under Fed. R. Civ. P. 52(c), made applicable by Fed. R. Bankr. P. 7052.

[16] *See* ECF No. 71, filed Oct. 1, 2025, p. 8.

pursuit of claims based on willful and malicious injury under 11 U.S.C. § 523(a)(6) and the full context of Corvallis Custom's complaint and trial memorandum. Intentional breach of contract may be sufficient to invoke section 523(a)(6) if it is accompanied by willful and malicious tortious conduct, which was alleged here and therefore not waived.[17] The court understood Corvallis Custom's comments in its trial memorandum to assert that it was not asserting *merely* a breach of contract, and made this ruling after the close of Corvallis Custom's case in chief so that Mr. Barba would have a full opportunity to refute Corvallis Custom's allegations in his evidentiary presentation. The court otherwise declined to render any decision on Mr. Barba's motion for judgment as a matter of law until after the close of the evidence. The court's decisions on the remainder of the motion are reflected in this ruling.

## Jurisdiction

This court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334, and authority to decide these claims as core proceedings under 28 U.S.C. § 157(b)(2)(I).[18] A bankruptcy court has jurisdiction to enter money judgments on claims in conjunction with finding that those obligations are nondischargeable.[19]

## Facts

This case is fact intensive and many of the facts were disputed. After carefully considering all the evidence presented as a whole and the credibility of each of the witnesses,[20] the court makes the following findings of fact:

---

[17] *Lockerby v. Sierra*, 535 F.3d 1038, 1040 (9th Cir. 2008).

[18] Although plaintiff identified the incorrect basis for jurisdiction, there is no dispute that the court has jurisdiction. Amended Complaint, ECF No. 19, filed Dec. 3, 2024, ¶ 2, Answer and Affirmative Defenses, ECF No. 20, filed Dec. 18, 2024, ¶ 2.

[19] *Deitz v. Ford (In re Deitz)*, 760 F.3d 1038, 1050 (9th Cir. 2014); *Cowen v. Kennedy (In re Kennedy)*, 108 F.3d 1015, 1017-18 (9th Cir. 1997), as amended (Mar. 21, 1997).

[20] In finding these facts, this court considered all the testimony and documents presented and weighed evidence in context to determine which portions of the testimony the court found to be credible. There were many facts stated by one witness that were directly contradicted by another witness or other admitted evidence. These findings of fact reflect that the court believed the witness or evidence that supported these facts and disbelieved the contrary testimony. In the interests of clarity, with respect to certain key facts and material disputes addressed herein, the court also makes specific findings about credibility.

I.      **People and Companies Involved**

       A.      **Corvallis Custom, Jesse Freeby, and Rebecca Freeby**

1.      Corvallis Custom was founded by Jesse Freeby and three others in 2009.  The business grew, and in 2014, Mr. Freeby bought out the other owners.  At all relevant times, Mr. Freeby owned 90% of Corvallis Custom and his wife Rebecca Freeby owned 10%.

2.      Mr. Freeby is the ultimate decision maker for and person in control of Corvallis Custom.

3.      Ms. Freeby is a senior project manager at Corvallis Custom.  She procures supplies, manages vendors, and handles customer service.

4.      Mr. Freeby consults with Ms. Freeby and Corvallis Custom's general manager before making significant decisions for Corvallis Custom.

5.      Mr. Freeby also owns other businesses, including some that relate to Corvallis Custom's work.  Athlete Zone is a brand Mr. Freeby and Corvallis Custom uses for producing product for student athletes under the NIL (name, image, likeness) rules.  Athlete Zone is 100% owned by Corvallis Custom.

6.      Corvallis Custom started out making apparel, then moved into banners and paper printing.

7.      Very early on, Corvallis Custom became licensed to produce work for Oregon State University.  Corvallis Custom eventually obtained a top tier license with Oregon State University.  Oregon State University is a very important customer of Corvallis Custom. Corvallis Custom spent over 15 years building its relationship with Oregon State University and increasing the amount of business it does for Oregon State University and its various groups and departments.

8.      Corvallis Custom has a good relationship with Oregon State University.  Every year it hires interns for the fall and spring term from the College of Business and the College of Fine Art.  Corvallis Custom mentors Oregon State University students.

9.      Confidentiality is very important to Corvallis Custom and Mr. Freeby.
Mr. Freeby was aware that at one time, a new Benny the Beaver mascot was created for Oregon
State University.  The University spent over $1 million getting ready for a big reveal of that
Benny.  Another company, a printer in Portland, put images of that Benny on its Twitter account
prematurely.  Oregon State University sued that company, and that company was driven out of
business.  Mr. Freeby does not want that to happen to his company.

10.      To avoid that kind of problem, Corvallis Custom requires all its employees to sign
non-disclosure and non-compete agreements.  This includes key employees as well as warehouse
employees.  Mr. Freeby explains the importance of confidentiality to his employees.

11.      The non-disclosure and non-compete agreements were very important to Corvallis
Custom.  Corvallis Custom wants to protect its customers' information as well as its own
information.  Corvallis Custom requires all its employees to sign these agreements because it
deals with a lot of customer information that may not be publicly announced yet.  Corvallis
Custom recognizes that its customers should be the first ones to announce their new brands and
marketing materials.  Corvallis Custom believes it is critical that all its employees understand
they cannot disclose information from Corvallis Custom without specific instructions to do so.

12.      The non-disclosure and non-compete agreements are also very important to
Corvallis Custom because Oregon State University is a huge customer, and if an employee were
to take and sell materials with Oregon State University brands, then Oregon State University
would be deprived of its royalties.

13.      Corvallis Custom has a server that contains all the company's computer data.
Each employee's work computer connects to the server.  Access to data on the server is
controlled at the folder level and requires user log-in information.  Employees have access to
only the information they need to do their jobs.  For example, as a warehouse manager,
Mr. Butler had access to Corvallis Custom's computer files necessary for production.  Mr. Butler
had manager privileges in the computer system, but not administrator privileges.

14.      Employees of Corvallis Custom are not authorized to save documents to the cloud, but only to accounts that Corvallis Custom controls on its computer network.  Although Corvallis Custom backs up its documents, it backs those documents up only to locations under its own control, and never to private storage space.

15.      Corvallis Custom uses software called Printavo, a system specifically created for the screen-printing industry, to manage its production.  Employees of Corvallis Custom can see real-time information about the status of production of projects for customers in the Printavo system.  Except for certain large customers, like Oregon State University, who had payment terms, Corvallis Custom's Printavo system was generally set up so that a product could not be produced until the customer made payment.

16.      Corvallis Custom has a retail shop for customers.  Other than that, Corvallis Custom does not provide public access to its warehouse, its computers or server, or its operations.

17.      Mr. Butler testified that, at times, athletes involved in Athlete Zone were given tours of the production facility.  Mr. Butler did not know whether those athletes signed confidentiality agreements before those tours.

18.      Mr. Butler saw Mr. Knowlton when he came to Corvallis Custom to pick up or drop off contract embroidery work.  Other vendors also had access to the warehouse to deliver supplies.

19.      Corvallis Custom charges by the quarter hour for its graphic design services.  That is a company-wide policy, even for production of one t-shirt.  Corvallis Custom requires its customers to approve designs before production.  For most customers, Corvallis Custom also requires payment before production.  Mr. Freeby must personally approve all discounts, and he occasionally authorizes employee discounts.  There is a tasking system in place to request discounts, and employees cannot do those discounts themselves.

20.      Corvallis Custom receives 3-5 payments in cash per year.  It receives more payments by check.  Corvallis Custom has a system to track payments made by cash or check.

21.    Corvallis Custom hires contract embroiderers to do its embroidery work at the wholesale level.  It has had four contract embroiderers over the years.  The first one worked out fine, but she sold her business.  Corvallis Custom worked with the buyer, but that was a bad experience.  The buyer tried to solicit Corvallis Custom's customers, so Corvallis Custom stopped working with that company.  Corvallis Custom then started using a contract embroiderer in Washington to avoid the possibility that the embroiderer would compete with it for local customers.

22.    Corvallis Custom occasionally does local sponsorships.  When it does so, it puts the project in the Printavo system and uses offsetting invoices to account for the sponsored part of the project.  The client pays any differential.

23.    Employees of Corvallis Custom were allowed to work on their own branding or personal projects, with restrictions.  Corvallis Custom has a company policy that employees must track their personal projects through Printavo and must pay for anything they do.  More specifically, if employees produced any personal product, they were required to pay for it and do the production printing after business hours.  Corvallis Custom's work for customers had priority, including on the printers.

24.    Mr. Butler did work on some personal projects while he worked for Corvallis Custom.  Mr. Butler paid for all the personal product he had Corvallis Custom produce for him.

**B.    Juan Jose Barba, III**

25.    Mr. Barba attended school doing a dual enrollment with Linn-Benton Community College and Oregon State University.

26.    Mr. Barba obtained his associate degree from Linn-Benton Community College in 2020.

27.    Mr. Barba obtained his bachelor's degree from Oregon State University in 2021, majoring in international business with a minor in marketing.

28.    Mr. Barba also has a certification from Google in digital marketing, obtained sometime between 2019 and 2023.

29.     Mr. Barba had an interest in clothing design and wanted to either own his own business or work for Nike.

30.     As early as 2022, Mr. Barba wanted an ownership interest in Corvallis Custom. In 2023, Mr. Barba had talks with Mr. Freeby wherein he told Mr. Freeby that he wanted to become a partner in Corvallis Custom.

**C.     Shawn Knowlton and Brands and Logos**

31.     Shaun Knowlton lives on Rickman Road in Keizer, Oregon, with his parents, David and Grace Knowlton, Mr. Barba, and Mr. Barba's girlfriend Saylor Goodwin.

32.     David and Grace Knowlton own DGK Incorporated, which was formed on February 19, 2019.  Grace Knowlton was the initial president of DGK.  Mr. Knowlton[21] was the general manager of DGK for six years.

33.     Also on February 19, 2019, Grace Knowlton registered herself as the owner of the assumed business name Brands & Logos.  On March 31, 2020, that assumed business name was changed to Brands and Logos.

34.     As of at least March 2, 2025, Mr. Knowlton became the president of DGK.

35.     Mr. Knowlton believes Brands and Logos is an assumed business name of DGK. The business engages in marketing using the name Brands and Logos and does reporting using the name DGK.

36.     Brands and Logos operates out of the garage at the home of David and Grace Knowlton on Rickman Road in Keizer, Oregon.

37.     Brands and Logos started as an embroidery, promotional products, and screen-printing company.  At the outset, Brands and Logos had only an embroidery machine, and not any other screen-printing machines or printers.  Brands and Logos had both retail customers and direct business customers that would send embroidery work to be done.

---

[21] All references in this decision to "Mr. Knowlton" refer to Shaun Knowlton.  In the limited instances where it is necessary to reference David Knowlton, this decision uses David Knowlton's first and last name to avoid confusion.

38.     At all relevant times, Brands and Logos did more than trade embroidery.  It also did business to business and retail sales of all kinds of promotional products, including those using embroidery, vinyl, screen printing, and printing.  Brands and Logos contracted out its artwork, vinyl, screen printing, and printing work.

39.     Brands and Logos did not have any in-house screen-printing capability before December 22, 2023.

40.     Brands and Logos was a direct competitor of Corvallis Custom in Oregon.

41.     Mr. Knowlton is not knowledgeable about artwork or mockups.  Brands and Logos does not have an art department.  Mr. Knowlton is not technologically savvy.

42.     Mr. Knowlton refers to Mr. Barba as "son" and Mr. Barba refers to Mr. Knowlton as "pop."  Mr. Knowlton testified that he treated Mr. Barba like a son.

**D.     Others**

43.     Steven "Lightning" McCoy is the associate athletic director for equipment operations at Oregon State University.

44.     Mr. McCoy is a good friend of Mr. Barba's uncle Carlos Garcia.

45.     Mr. McCoy testified that licensing is the number one requirement that must be met by a vendor producing product for the Oregon State University athletics department.  Mr. McCoy is not involved in the licensing process.

46.     Mr. McCoy sent work to Corvallis Custom when Mr. Barba worked there.  Mr. McCoy saw Mr. Barba as the "center" of Corvallis Custom.  Mr. Barba was the only person Mr. McCoy worked with at Corvallis Custom.

47.     Mr. McCoy knows that Corvallis Custom has an art department that has done work for Oregon State University athletics.

48.     Taylor Westbrook works at Oregon State University athletics for Mr. McCoy.

49.     Mr. Westbrook worked with Corvallis Custom in 2023 on behalf of Oregon State University athletics.  Mr. Barba was his point of contact at Corvallis Custom.

50.     Jason Travon Butler worked for Corvallis Custom from September 2022 through April 2024. He started out as a project manager, then worked as a warehouse assistant, and ultimately became the warehouse manager.

51.     Mr. Butler worked with Mr. Barba, and Mr. Barba provided part of his training.

52.     Luke Escanlar has a limited liability company called ESC. ESC sells clothing and hats online and at popup events. Mr. Escanlar owns ESC with a business partner. The business partner selected Corvallis Custom to do some work for ESC.

53.     Luke Escanlar met Mr. Barba in approximately 2023. Mr. Escanlar's business partner introduced Mr. Escanlar to Mr. Barba while Mr. Barba worked for Corvallis Custom. Mr. Escanlar assumed (incorrectly) that Mr. Barba was the owner of Corvallis Custom.

54.     Mr. Escanlar is friends with Mr. Barba.

55.     In January 2025, Mr. Escanlar went to work for Brands and Logos as an assistant to the marketing department, working mostly on-site at the Keizer property on Rickman Road.

56.     Rene Camacho is the owner and manager of Endzone Studios, a retail shop in Corvallis that sells vintage sneakers. Endzone Studios occasionally needs printing services for t-shirts to be sold in its store, and promotional materials for the store and its own brand.

57.     Mr. Camacho is friends with Mr. Barba.

58.     Hogan Arey is the assistant golf professional at the Trysting Tree Golf Club in Corvallis and manages the pro shop there. Mr. Arey's father is the head golf professional at Trysting Tree. From time to time, Trysting Tree needs to order signage and merchandise.

59.     Mr. Arey is friends with Mr. Barba.

60.     Lori Dollar is the territory manager for SanMar Wholesale for Oregon and Southwest Washington. SanMar is a wholesale apparel manufacturer and a supplier to Corvallis Custom.

61.     Frankie Saboorizadeh, is a former warehouse manager for Corvallis Custom, who later went to work for Brands and Logos. Mr. Saboorizadeh is no longer an employee of Brands and Logos.

62.     The company Stahls is a vendor to Corvallis Custom.  Ms. Freeby did a video tour of Corvallis Custom's front of the house and warehouse for Stahls' blog.  Ms. Freeby did not recall the contents of the video, other than that the video showed components of the production process.  Ms. Freeby did not know if the video remained on Stahls' blog or how many views the video had received.

63.     Oregon State University's primary contractor for embellishments is McKenzie SewOn in Eugene, Oregon.  However, sometimes McKenzie SewOn is unavailable, so other contractors are needed to provide embellishments.

## II.    Mr. Barba's Employment at Corvallis Custom

64.     In 2019, Mr. Barba was taking a course at Oregon State University where the final group project was to do a marketing plan for an existing business.  Mr. Barba approached Corvallis Custom about the possibility, and his student group ultimately chose to do a marketing plan for Corvallis Custom.  Mr. Barba and his student group completed a marketing plan for Corvallis Custom.

65.     After the group project was complete and the group received an A, Mr. Barba provided the marketing plan to Mr. Freeby in July 2019.  Mr. Freeby then met with Mr. Barba.

66.      Mr. Freeby recognized that Mr. Barba had an interest in apparel and wanted to start his own brand.  Corvallis Custom hired Mr. Barba for a paid internship position that started in September 2019.

67.     On Mr. Barba's first day of work, Corvallis Custom required Mr. Barba to sign a Non-Disclosure Agreement and a Non-Compete agreement as a condition of employment. Mr. Barba understood that he needed to sign these agreements if he wanted to work for Corvallis Custom.  Mr. Barba read over the agreements before he signed them.  Mr. Barba acknowledged that he had no obligations to others that would prevent him from signing them.

68.     The Non-Disclosure Agreement that Mr. Barba signed with Corvallis Custom provided in relevant part:

1. Definition of Confidential Information. For purposes of this Agreement, "Confidential Information" shall include all information or material that has or could have commercial value or other utility in the business in which COMPANY is engaged. This includes but is not limited to: customer information, branding, vendor information, financial data, and electronic communications.

2. Definition of Trade Secrets. For the purposes of this Agreement, "Trade Secrets" shall include all information or material pertaining to the formula, practice, process, design, instrument, pattern, or compilation of information that is not generally known or reasonably ascertainable, by which a business can obtain an economic advantage over competitors or customers.

3. Exclusions from Confidential Information. RECEIVING PARTY's obligations under this Agreement do not extend to information that is:

   a. publicly known at the time of disclosure or subsequently becomes publicly known through no fault of the RECEIVING PARTY; or
   b. Is disclosed by RECEIVING PARTY with COMPANY's prior written approval.

4. Obligations of RECEIVING PARTY. RECEIVING PARTY shall hold and maintain the confidential information in strictest confidence for the sole and exclusive benefit of the COMPANY. RECEIVING PARTY shall carefully restrict access to Confidential Information to employees, contractors and third parties as is reasonably required and shall require those persons to sign nondisclosure restrictions at least as protective as those in this Agreement. RECEIVING PARTY shall not, without prior written approval of COMPANY, use for RECEIVING PARTY's own benefit, publish, copy, or otherwise disclose to others, or permit the use by others for their benefit or to the detriment of COMPANY, any Confidential Information.  RECEIVING PARTY shall return to COMPANY any and all records, notes, and other written, printed, or tangible materials in its possession pertaining to Confidential Information immediately if COMPANY requests it in writing.

5. Time Periods. The nondisclosure provisions of this Agreement shall survive the termination of this Agreement and RECEIVING PARTY's duty to hold Confidential Information in confidence shall remain in effect until the Confidential Information no longer qualifies as a trade secret or until COMPANY sends RECEIVING PARTY written notice releasing RECEIVING PARTY from this Agreement, whichever occurs first.

6. Injunctive, Other Equitable Relief, and Liquidated Damages. The parties agree that the damages, which the COMPANY may suffer upon violation of this Agreement, are irreparable and potentially intangible in nature. Therefore, the parties agree that the COMPANY shall be entitled to1 injunctive relief, including attorney fees, paralegal fees, and expert fees, and all other fees,

costs and expenses actually incurred and reasonably necessary in connection therewith, as determined by the judge or arbitrator at trial, arbitration or other proceeding, or on any appeal or review, in addition to all other amounts provided by law to enforce the Agreement. The RECEIVING PARTY agrees that the remedy at law for any breach or threatened breach by a party may, by its nature, be inadequate, and that the COMPANY will be entitled, in addition to damages, to a restraining order, temporary or permanent injunctive relief, specific performance, and other appropriate equitable relief, without showing or proving that any monetary damage has been sustained.

The parties agree that each instance of breach of this contract damages BUSINESS in the amount of $5000.00 and that EMPLOYEE shall pay to BUSINESS such sum in each instance of breach (i.e. for each solicitation made to one of BUSINESS's customers, in competition with BUSINESS, during or for the two years following EMPLOYEE's employment with BUSINESS). The parties agree that quantifying losses arising from EMPLOYEE's breach is inherently difficult insofar as breach may impact the BUSINESS's reputation, intellectual property, and general business practices, and the parties further stipulate that the agreed upon sum is not a penalty, but rather a reasonable measure of damages, based upon the parties' experience in the industry and given the nature of the losses that may, result from breach.

Corvallis Custom was the Company or Business in this agreement, and Mr. Barba was the Receiving Party or Employee.

69.     The Non-Compete that Mr. Barba signed with Corvallis Custom provided in relevant part:

EMPLOYEE and BUSINESS acknowledge that as a result of the employer/employee relationship EMPLOYEE will from time to time receive, or create confidential information related to the business operation. This confidential information includes, but is not limited to, trade secrets, future promotional plans, financial information, customer lists, vendor information, pricing strategies, and other non-public information that might be useful to competitors. The parties further acknowledge that the BUSINESS will expend substantial resources and that such investment would be adversely affected if EMPLOYEE engaged in competition with BUSINESS during or after the termination of employment.

From and after the signing of this agreement, the EMPLOYEE shall not, directly or indirectly engage in, or have any interest in any corporation, partnership, limited liability company, association, joint venture, or other entity that engages in, any "Competitive Activity," as defined in this section during the employment period and for a period of 2 years after the date of last employment with BUSINESS.

1. **Definition of Competitive Activity**. "Competitive Activity" means the ownership, operation, management, consultation, or control of any person or business, or any employment with any business that directly or indirectly competes with BUSINESS within the "Protected Area."

2. **Definition of Protected Area**. "Protected Area" is defined as state of Oregon.

3. **Injunctive, Other Equitable Relief and Liquidated Damages**. The parties agree that the damages, which may be suffered by BUSINESS upon violation of this agreement, are irreparable and potentially intangible in nature. Therefore, the parties agree that BUSINESS shall be entitled to injunctive relief, including attorney fees, paralegal fees, expert fees, and all other fees, costs, and expenses actually incurred and reasonably necessary in connection therewith, as determined by the judge or arbitrator at trial, arbitration, or other proceeding, or on any appeal or review, in addition to all other amounts provided by law to enforce this agreement. The EMPLOYEE agrees that the remedy at law for any breach or threatened breach by a party may, by its nature, be inadequate, and that the BUSINESS will be entitled, in addition to damages, to a restraining order, temporary and permanent injunctive relief, specific performance, and other appropriate equitable relief, without showing or proving that any monetary damage has been sustained.

The parties agree that each instance of breach of this contract damages BUSINESS in the amount of $5000.00 and that EMPLOYEE shall pay to BUSINESS such sum in each instance of breach (i.e. for each solicitation made to one of BUSINESS's customers, in competition with BUSINESS, during or for the two years following EMPLOYEE's employment with BUSINESS). The parties agree that quantifying losses arising from EMPLOYEE's breach is inherently difficult insofar as breach may impact the BUSINESS's reputation, intellectual property, and general business practices, and the parties further stipulate that the agreed upon sum is not a penalty, but rather a reasonable measure of damages, based upon the parties' experience in the industry and given the nature of the losses that may result from breach.

4. . . .

5.  **Merger Clause.** This Agreement constitutes the entire agreement and understanding of the parties with respect to the subject matter of this Agreement and supersedes all prior understandings and agreements, whether written or oral, among the parties with respect to such subject matter. If any provision of this Agreement is invalid or unenforceable in any respect for any reason, the validity and enforceability of such provision in any other respect and of the remaining provisions of this Agreement will not be in any way [im]paired [sic.].

Corvallis Custom was the Business in this agreement, and Mr. Barba was the Employee.

70.    Mr. Barba worked as an intern for Corvallis Custom while he was completing his degree at Oregon State University.  He wanted to try project management, so Corvallis Custom made him a junior project manager.  Corvallis Custom trained Mr. Barba on screen-printing and gave him access to graphic design tools.  Mr. Barba did not design for customers but shadowed other employees in the design department.

71.    As an intern, Mr. Barba had access to Corvallis Custom's marketing information.

72.    Because of the COVID-19 pandemic and governmental restrictions on in-person work, there were times that Corvallis Custom was unable to have Mr. Barba work for it.  During those times, Mr. Barba worked for another of Mr. Freeby's companies.  Later, Mr. Barba went back to Corvallis Custom.

73.    Mr. Barba's responsibilities grew over time.  Corvallis Custom promoted him to project manager, and then to sales manager.  After approximately a year as sales manager, Corvallis Custom promoted Mr. Barba to general manager.

74.    As a junior project manager, Mr. Barba obtained access to the jobs folders in Printavo.  As a sales manager, Mr. Barba obtained access to Corvallis Custom's marketing strategy.

75.    As general manager, Mr. Barba had access to virtually everything on Corvallis Custom's NAS server, including employee files, tax returns, and other materials that were restricted from other employees.  Mr. Barba also had access to all of Corvallis Custom's software, including Printavo, Microsoft office products, the Google suite of programs, mail programs, and Adobe design software.

76.    Because Mr. Barba did not have a lot of experience as a general manager, he worked with Mr. Freeby, Ms. Freeby, and a consultant Corvallis Custom used, Marshall Atkinson.  Corvallis Custom was essentially providing on-the-job training to Mr. Barba to grow into his role as a general manager.

77.    As a general manager, Mr. Barba worked with both customers and vendors. Mr. Barba worked in both sales and production.  When asked to describe his role as general

manager, Mr. Barba testified at his deposition that it was to "[r]un the business" and involved "doing everything a business owner should do."

78.     In January 2023, Corvallis Custom had Mr. Barba attend a major trade show and conference in Long Beach, California, to learn more about the industry.

79.     Mr. Barba was unhappy for a long time at Corvallis Custom. He did not think he was making as much money as he wanted to make. Mr. Barba asked for raises and did not receive as many or as much as he hoped.

80.     Mr. Barba was also unhappy because he believed that whenever he and Ms. Freeby disagreed about how to proceed, Mr. Freeby would side with his wife and proceed as Ms. Freeby suggested instead of how Mr. Barba suggested.

81.     In April 2023, Mr. Barba went to a Mariners game in Seattle with Mr. Knowlton. After he returned from that game, he told Mr. Freeby that he wanted a raise by October 13 (his birthday) or he would leave Corvallis Custom. In April 2023, Mr. Barba's hourly wage was $21/hour. He wanted an increase to $25/hour and further increases to $30/hour.

82.     Before Mr. Barba left Corvallis Custom, he discussed with Mr. Knowlton the fact that he was unhappy. He did not like the stressful dynamic of working for a husband-and-wife team. Specifically, Mr. Barba thought that any time Mr. Barba and Ms. Freeby disagreed, Mr. Freeby would take Ms. Freeby's side. Mr. Barba thought he should be treated more highly than Ms. Freeby in the management chain.

83.     In July or August 2023, Mr. Barba wanted to either buy into Corvallis Custom or be paid more. Mr. Freeby set out a list of goals and metrics that Mr. Barba would have to achieve to obtain a raise. Mr. Freeby wanted to see the results of training Mr. Barba as a general manager before he gave Mr. Barba a further raise.

84.     When Mr. Barba was paid in October, he did not have a raise.

85.     Mr. Barba believes that he created Corvallis Custom's Athlete Zone business and wanted to continue Athlete Zone work after he left Corvallis Custom. Mr. Barba thought he could have been an owner of Athlete Zone.

86.     Mr. Barba's last day at Corvallis Custom was December 23, 2023.

87.     Mr. Barba acknowledged that while he was part of Corvallis Custom's executive team, the line between work and personal disappeared over time.

88.     On April 25, 2024, Mr. Barba emailed Corvallis Custom's lawyer and stated, in relevant part:

> Speaking frankly, I'd never engage in professional endeavors with my spouse, out of respect for personal integrity. If only little bro had heeded my advice, and his wife adhered to a singular role, perhaps circumstances would be different. There were numerous instances and conversations between your client and me regarding the performance of his wife and how it negatively affected the business and team morale - I can recall multiple instances in which your client would tell me he'd remove her from the business to keep me but as we've all come to know, JB is a liar. Over one hundred thousand dollars in missed opportunity, broke my heart because he didn't feed Corvallis Customs's star player the rock.

Mr. Barba believed himself to be the star player at Corvallis Custom.

## III.    Brands and Logos Becomes a Contract Embroiderer for Corvallis Custom

89.     In 2019, Mr. Knowlton approached Corvallis Custom about doing embroidery work for Corvallis Custom. Mr. Freeby met with Mr. Knowlton and explained his prior problem with the embroiderer who tried to solicit Corvallis Custom's customers.

90.     Mr. Knowlton explained that he had been in this business before, had no retail locations, and only wanted to work for print shops and not deal with retail customers.

91.     Based on Mr. Knowlton's representations, Corvallis Custom hired Brands and Logos to do a few orders. The fact that Brands and Logos did not do retail sales was one thing that led to Corvallis Custom using Brands and Logos for embroidery. Brands and Logos did good quality embroidery work for Corvallis Custom. Over time, Corvallis Custom increased the work it sent to Brands and Logos.

92.     Corvallis Custom used Brands and Logos to do embroidery work starting in 2020.

93.     While working as a contract embroiderer for Corvallis Custom, Mr. Knowlton had limited access to Corvallis Custom's Printavo system. Specifically, he had limited vendor access to only information on the specific jobs that Brands and Logos was producing for Corvallis Custom. He did not have access to pricing information.

94.     In 2021, when Brands and Logos was doing contract embroidery work for Corvallis Custom, Mr. Barba met Mr. Knowlton.  Mr. Barba was working at Corvallis Custom.

95.     Mr. Barba worked with Mr. Knowlton as part of his job to work with vendors.

96.     Mr. Knowlton assumed that Mr. Barba was a partner and had a financial stake in Corvallis Custom, although that was not true.

97.     Mr. Barba became friends with Mr. Knowlton.  At one point, Mr. Barba was bitten when he broke up a dog fight and Mr. Knowlton dressed his wound.

98.     Corvallis Custom thought that Brands and Logos was only working for other contract print shops because Mr. Knowlton told Mr. Freeby that.

99.     However, Brands and Logos accepted customers for retail print jobs before Mr. Barba left Corvallis Custom.  Mr. Knowlton did not tell Mr. Freeby this information.

100.     Corvallis Custom and Mr. and Ms. Freeby did not know that Brands and Logos was competing with it for artwork, vinyl, screen printing, and printing work.

101.     Mr. Barba knew that Brands and Logos had screen-printing jobs.

102.     Mr. Barba wanted to keep Brands and Logos as an embroidery contractor to Corvallis Custom.  In addition to his hourly wage, Mr. Barba received a commission on product that he sold.  Mr. Barba knew that he would lose a lot of money if he could not sell embroidered products.

103.     Mr. Barba testified that both he and Mr. Knowlton told Mr. Freeby that Brands and Logos had screen-printing customers.  The court did not find this testimony credible.

104.     At some point, Brands and Logos contacted Corvallis Custom about possibly doing screen printing work, but Brands and Logos never had Corvallis Custom do any of that work.

105.     Mr. Knowlton testified that Brands and Logos did not use Corvallis Custom to do any work.  Mr. Barba testified that Mr. Knowlton was not using Corvallis Custom to do its screen-printing jobs because he thought Corvallis Custom was too expensive.

106.    The real reason that Brands and Logos did not openly use Corvallis Custom to do any work was because Mr. Knowlton did not want to disclose to Corvallis Custom that Brands and Logos was competing with it.

107.    Mr. Barba did not want Corvallis Custom to know about Mr. Knowlton's competition with Corvallis Custom, because it could impair his commissions if Corvallis Custom stopped using Brands and Logos to do embroidery.

## IV.    Mr. Barba's Scheme to Aid Himself and Brands and Logos While Working for Corvallis Custom

### A.    While Employed by Corvallis Custom, Mr. Barba Directly Aided Corvallis Custom's Competitor Brands and Logos and Mr. Knowlton in Exchange for Personal Benefit

#### 1.    Mr. Barba Did Free Work for Brands and Logos

108.    By late 2022, Mr. Knowlton started sending projects to Mr. Barba to do.

109.    On January 1, 2023, Mr. Knowlton emailed Mr. Barba at his Corvallis Custom email address about preparing a file to use for Brands and Logos' client Envision.  Mr. Barba emailed back on January 4, 2023, with a .jpg file for Envision.  Brands and Logos was not billed for this work and did not pay for this work.  The court finds that this is one instance of competition because Mr. Barba sent one file to Brands and Logos.

110.    On January 12, 2023, Mr. Knowlton emailed Mr. Barba at his Corvallis Custom email address about preparing mockups for several different garments for Brands and Logos' client Oregon Garden Resort.  Later that day, Mr. Barba emailed Mr. Knowlton back with six mockups.  Brands and Logos was not billed for this work and did not pay for this work.  The court finds that this is six instances of competition because Mr. Barba sent six files to Brands and Logos.

111.    On January 30, 2023, Mr. Knowlton emailed Mr. Barba at his Corvallis Custom email address asking for his help changing the wording on a design, because Mr. Knowlton did not know how to do it.  On February 3, 2023, Mr. Barba emailed Mr. Knowlton back with the

revised design.  Brands and Logos was not billed for this work and did not pay for this work.
The court finds that this is one instance of competition because Mr. Barba sent Mr. Knowlton
one design.

112.     On April 4, 2023, Mr. Knowlton emailed Mr. Barba at his Corvallis Custom email
address asking him to create a mockup for Brands and Logos' client Hubbard Inn.  On April 6,
2023, Mr. Barba emailed back a mockup of the front and back of the shirt.  Brands and Logos
was not billed for this work and did not pay for this work.  The court finds that this is two
instances of competition because Mr. Barba provided mockups for both the front and the back of
the shirt.

113.     On May 23, 2023, Mr. Knowlton emailed Mr. Barba at his Corvallis Custom
email address asking him to create a mockup for Brands and Logos' client A&T Construction.
On May 24, 2023, Mr. Barba emailed back mockups of the front and back of the shirt on two
different color shirts.  On May 27, 2023, Mr. Knowlton again emailed Mr. Barba at his Corvallis
Custom email address asking him to create a mockup for Brands and Logos' client A&T
Construction, but this time on a hat.  On May 29, 2023, Mr. Barba emailed back a mockup of the
hat with a red and white logo.  On May 31, 2023, Mr. Barba emailed back another mockup of the
hat with a black logo.  Brands and Logos was not billed for this work and did not pay for this
work.  The court finds that this is six instances of competition because Mr. Barba provided
mockups of the front and back of the shirt, each on two colors, and two mockups of hats.

114.     On May 24, 2023, Mr. Knowlton emailed Mr. Barba at his Corvallis Custom
email address asking him to revise a mockup and create new art for Brands and Logos' client the
Boy Scouts.  Mr. Barba responded asking Mr. Knowlton to send the file if the work was needed
as soon as possible.  Mr. Knowlton specified what changes he wanted and said that "I assume
you still have this stuff saved there."  Brands and Logos was not billed for this work and did not
pay for this work.  Despite a verbal request at Mr. Knowlton's deposition, Mr. Knowlton
provided no documents about this project.  The court finds that this is one instance of

competition because Mr. Barba agreed to do the work, but the record does not clearly show exactly what work he performed.

115.    On June 4, 2023, Mr. Knowlton emailed Mr. Barba at his Corvallis Custom email address asking him to prepare mockups of the front and back of a coach's shirt for Brands and Logos.  On June 8, 2023, Mr. Barba emailed back a mockup of the front and back of the shirt with the requested design.  Brands and Logos was not billed for this work and did not pay for this work.  The court finds that this is two instances of competition because Mr. Barba provided mockups of the front and back of the shirt.

116.    On June 4, 2023, Mr. Knowlton emailed Mr. Barba at his Corvallis Custom email address asking him to prepare mockups of the front and back of a shirt for Brands and Logos' client Home Depot.  On July 1, 2023, Mr. Barba emailed back a mockup of the front and back of the shirt with the requested design in the font most commonly used on MLS and Euro league jerseys.  On July 3, 2023, Mr. Barba emailed back more mockups of the front and back of the shirt with the requested design in the Bahnschrift font.  Later that same say, Mr. Knowlton asked for further revisions, which Mr. Barba said he would put in after the client confirmed placement. Brands and Logos was not billed for this work and did not pay for this work.  The court finds that this is four instances of competition because Mr. Barba provided mockups of the front and back of the shirt two times.

117.    On July 21, 2023, Mr. Knowlton emailed Mr. Barba at his Corvallis Custom email address with a .pdf file attached asking Mr. Barba to make changes to the background of a logo.  Despite a verbal request at Mr. Knowlton's deposition, Mr. Knowlton provided no documents about this project.

118.    On September 25, 2023, Mr. Knowlton emailed Mr. Barba at his Corvallis Custom email address asking him to prepare a mockup of the front of a jacket for Brands and Logos' client the Mt. Hood Mustang Club.  On September 26, 2023, Mr. Barba emailed back a mockup of the front the jacket with the requested design.  Later that day, Mr. Knowlton asked for a further mockup of the same logo on a different jacket, which Mr. Barba also provided.  Brands

and Logos was not billed for this work and did not pay for this work. The court finds that this is two instances of competition because Mr. Barba provided two mockups.

119.    On October 23, 2023, Mr. Knowlton emailed Mr. Barba at his Corvallis Custom email address asking him to prepare two logos for the front and back of a shirt for Brands and Logos' client Home Depot. Later that day, Mr. Barba emailed back a mockup of the front and back of the shirt with the requested designs. Mr. Knowlton and Mr. Barba discussed the timing of a telephone call that night. Then, the next day, Mr. Barba provided Mr. Knowlton with another mockup of a sweatshirt with a similar logo. Brands and Logos did not pay for this work. Mr. Barba kept this mockup in an Adobe Creative Cloud drive in his girlfriend's name. The court finds that this is four instances of competition because Mr. Barba provided mockups of the front and back of the shirt two times.

120.    On October 26, 2023, Mr. Barba created a project in the Printavo system where Brands and Logos was listed as the customer. The end product was to be for WC Construction, a customer of Corvallis Custom. Mr. Barba created the quote and bypassed the artwork department. He manually changed the pricing to reduce the cost of one product from $10 to $2.25 per item, and the other product from $17 to $8.25 per item. He also entered a further 50% friends and family discount. He manually entered a false payment of $84.00 on October 31, 2023, via "other," stating "Corvallis custom owes brands and logos absurd amount." As a result, the requirement for payment for this work completely disappeared.

121.    On October 30, 2023, Mr. Knowlton emailed Mr. Barba at his Corvallis Custom email address regarding a mockup that he had previously discussed with Mr. Barba for Brands and Logos' client Destiny Landscaping. Brands and Logos did not pay for this work. The court finds that this is one instance of competition because Mr. Barba discussed doing work for Brands and Logos with Mr. Knowlton.

122.    On October 30, 2023, Mr. Barba created a project in the Printavo system where Brands and Logos was listed as the customer. The end product was to be for Destiny Landscaping, a Brands and Logos customer. Mr. Barba created the quote and bypassed the

artwork department.  He manually changed the pricing to an arbitrary amount.  He also entered a further 50% friends and family discount.  Mr. Barba caused a greater quantity of items to be printed than were listed on the invoice.  He manually entered a false payment of $84.00 on October 31, 2023, via "other," stating "CC owes Brands and Logos."

123.    On November 1, 2023, Mr. Knowlton emailed Mr. Barba at his Corvallis Custom email address asking Mr. Barba to do some work on the logos for the back of the shirts for Brands and Logos' client Destiny Landscaping.  Brands and Logos did not pay for this work.

124.    On November 1, 2023, Mr. Barba created a project in the Printavo system where Brands and Logos was listed as the customer.  The end product was to be for Brands and Logos for fair week.  Mr. Barba created the quote and sent the artwork through the artwork department.  He manually changed the pricing to an arbitrary amount.  Mr. Barba moved the order into production and it was completed.  Mr. Barba manually entered a false payment of $20.00 backdated to October 31, 2023, via "other," stating "CC owes Brands and Logos money."  The court finds that this is two instances of competition because Mr. Barba changed the pricing and entered a false payment to benefit Brands and Logos.

125.    On November 1, 2023, Mr. Knowlton emailed Mr. Barba at his Corvallis Custom email address asking him to edit two logos for the fair for a Brands and Logos client.  Mr. Barba must have done this editing because product was produced for this project.  The court finds that this is two instances of competition because Mr. Barba edited two logos.

126.    Also on November 1, 2023, Mr. Knowlton emailed Mr. Barba at his Corvallis Custom email address asking for his opinion on two logos for Brands and Logos' client Celtic.  Mr. Barba responded that they looked good.  Later that day, Mr. Barba sent two mockups to Mr. Knowlton for Celtic.  Brands and Logos did not pay for this work.  The court finds that this is four instances of competition because Mr. Barba commented on two logos and created two mockups.

127.    On November 1, 2023, Mr. Barba created a project in the Printavo system where Brands and Logos was listed as the customer.  The end product was for Celtic, a Brands and

Logos customer.  Mr. Barba created the quote and sent the artwork through the artwork department.  He manually changed the pricing to an arbitrary amount.  He also entered a further 50% friends and family discount.  Mr. Barba moved the order into production and it was completed.  Mr. Barba manually entered a false payment of $84.00 backdated to October 31, 2023, via "other," stating "Paying off cc balance to Brands and Logos."  The court finds that this is two instances of competition because Mr. Barba changed the pricing and entered a false payment to benefit Brands and Logos.

128.    On November 10, 2023, Mr. Knowlton emailed Mr. Barba at his Corvallis Custom email address asking for artwork on the Home Depot mockup previously provided on October 24, 2023.  The next day, Mr. Barba responded by sending a print ready file to Mr. Knowlton.  Brands and Logos did not pay for this work.  The court finds that this is one instance of competition because Mr. Barba sent one file.

129.    On November 19, 2023, Mr. Knowlton emailed Mr. Barba at his Corvallis Custom email address regarding revisions to the work for Brands and Logos' client Destiny Landscaping.  On November 22, 2023, Mr. Barba emailed the revised mockup back to Mr. Knowlton.  On November 26, 2023, Mr. Knowlton asked for further revisions on this mockup.  Mr. Barba responded on November 27, 2023, sending back five DTF ready print files.[22]  Brands and Logos did not pay for this work.  The court finds that this is six instances of competition because Mr. Barba revised one mockup and sent five print ready files.

130.    On November 27, 2023, Mr. Barba emailed Mr. Knowlton two DTF ready print files for Brands and Logos' client Celtic.  The court finds that this is two instances of competition because Mr. Barba sent Mr. Knowlton two print ready files.

131.    At some point while Mr. Barba worked for Corvallis Custom, he made four mockups for Brands and Logos' client Royal Tree Service.  Brands and Logos did not pay for this work.  Mr. Barba saved the mockups to his own personal Google Drive so Mr. Knowlton

---

[22] A DTF machine is a large machine used to print designs for garments.

could access those images directly.  The court finds that this is four instances of competition because Mr. Barba made four mockups.

132.    Mr. Knowlton could not recall if he ever paid Corvallis Custom for design work.

> **2.    Mr. Barba Specifically Aided Brands and Logos in Undercutting Corvallis Custom's Quote to Camp Attitude and Used Corvallis Custom's Work to Win a Large Job for Brands and Logos**

133.    In February 2023, Mr. Barba did a quote on behalf of Corvallis Custom in Printavo for Camp Attitude.  He told Mr. Freeby that this would be a huge order for apparel for all campers and staff.

134.    Corvallis Custom's designer Elise started to work on all the mockups and a lot of proofs were produced.

135.    Corvallis Custom did a lot of work on this project.

136.    Brands and Logos also provided a quote to Camp Attitude.  At the time Mr. Knowlton provided a quote to Camp Attitude, he knew that Camp Attitude was shopping around for quotes from other producers.

137.    On May 26 and 27, 2023, Mr. Knowlton emailed Mr. Barba at his Corvallis Custom email address with files relating to Camp Attitude.  On May 29, 2023, Mr. Barba emailed .png files with logos for Camp Attitude back to Mr. Knowlton, asking him to "have clients approve spacing of wording before proceeding."  On the same day, Mr. Barba emailed Mr. Knowlton a mockup of a shirt with the Camp Attitude logo on it.  The email stated, "I cannot create final printreadys until they okay – we are 1hr worth of design time for this client."  The artwork that Mr. Barba emailed to Mr. Knowlton was Corvallis Custom's work product.  The court finds that this is two instances of competition because Mr. Barba advised Mr. Knowlton to obtain client consent before proceeding and created one mockup.

138.    Mr. Barba testified that the comment about one hour worth of design time was intended to be part of a trade of services with Mr. Knowlton.  Mr. Barba testified that he traded

work at Mr. Knowlton's house for design work, and that Mr. Knowlton kept a running log of all that time. The court did not find any of this testimony credible.

139.    Brands and Logos did not pay for this Camp Attitude work.

140.    On May 30, 2022, Mr. Knowlton emailed Mr. Barba at his Corvallis Custom email address with a copy of the order that Brands and Logos received from Camp Attitude. Mr. Knowlton stated in the email that:

> I hate to ask this but I think because this is a large dollar order I need to have some mock ups. I hope that this will be easier for you because we have what we need now. I want to see your face when you read this. I can wait for these until thursday so you have more time. Im sorry johnny but I was thinking about it and i think i need to cover my ass. I will make sure you are rewarded.
> the art was approved so once thats good to go you will be able to mock up the buddy shirt one black shirt the orange shirts and one camper shirt
> Please also do the mock up for the hoodies and the zip ups.
> Let me know if you want to punch me or something I will need a few days to prepare.

141.    At his deposition, Mr. Knowlton claimed he did not remember what he meant when he wrote that he would make sure Mr. Barba was rewarded.

142.    Mr. Knowlton testified at trial that the promise of a reward was only a figure of speech, meaning that generally people will be rewarded when they do something good. The court did not find that testimony to be credible.

143.    Mr. Barba testified at trial that the promise of a reward related to his running balance of time that he traded with Mr. Knowlton. He also testified that he anticipated that Corvallis Custom would be rewarded. Mr. Barba said there was no specific reward promised, but that this was part of Mr. Knowlton's willingness to continue doing embroidery work for Corvallis Custom. The court did not find any of this testimony to be credible.

144.    Mr. Barba untruthfully told Mr. Freeby that Corvallis Custom won the bid for Camp Attitude's work.

145.    In fact, the quote for Camp Attitude in Corvallis Custom's Printavo system was zeroed out completely and then cancelled. All the production notes were erased.

146.     Instead, Camp Attitude became a client of Brands and Logos in 2023.  Camp Attitude continued to order product from Brands and Logos in 2024 and 2025.

147.     In 2023, Mr. and Ms. Freeby did not notice that the Camp Attitude quote was cancelled and erased because they were out of the office due to deaths in their families.

148.     Mr. Freeby learned in 2024, while doing an audit, that the quote for Camp Attitude was cancelled and the information in it was deleted.

149.     Mr. Barba testified that he was not involved in Corvallis Custom's quote to Camp Attitude and had no idea if he was aware of that quote.  Mr. Barba testified he did not tell Mr. Freeby that Corvallis Custom won the bid for Camp Attitude's work.  The court did not find any of this testimony credible.

### 3.     Mr. Barba Provided Business Advice to Mr. Knowlton and Brands and Logos

150.     On January 12, 2023, Mr. Knowlton emailed Mr. Barba at his Corvallis Custom email address, telling him that he was going to purchase a UV DTF (Direct to Filament) machine, for printing items like glass, plastic, and metals.  Mr. Barba responded that the learning curve for the UV DTF machine was "pretty crazy" but said "[t]hat's good though something else we get to play with hahaha."  The court finds that this is one instance of competition because Mr. Barba provided information about the learning curve on a machine that would be used by Brands and Logos to compete with Corvallis Custom.

151.     On October 27, 2023, Mr. Knowlton forwarded an email to Mr. Barba at his Corvallis Custom email address regarding a solicitation he had received to purchase a specific model of a Roland vinyl printer/cutter at a discount.  Mr. Knowlton asked Mr. Barba if it was a good deal.  Mr. Freeby was not copied on this email and neither Mr. Barba nor Mr. Knowlton informed Mr. Freeby of this message.

152.     On November 12, 2023, Mr. Knowlton emailed Mr. Barba at his Corvallis Custom email address, asking if Mr. Barba could access certain items on a Google Drive.  The Google Drive contained images to be used for marketing Brands and Logos, including for use on

Brands and Logos' website.  Mr. Barba confirmed he had access, and said he would call

Mr. Knowlton.  Mr. Barba was assisting Brands and Logos with its marketing.  Mr. Barba stated

that "my goal is to work hand in hand with the current SEO [search engine optimization] team

and help them align with goals you and I set for the following year."  Mr. Barba did not inform

Mr. Freeby that he was doing this marketing work for Brands and Logos, and Mr. Freeby did not

learn of this until after Mr. Barba left his employment with Corvallis Custom and returned his

work computer.  The court finds that this is three instances of competition because Mr. Barba

was owner of the Google Drive containing information intended to benefit a competitor of

Corvallis Custom, he shared access to that Google Drive with Mr. Knowlton, and he provided

marketing advice to Mr. Knowlton.

      153.    Mr. Knowlton did not know how to work with his SEO (search engine

optimization) company to improve the Brands and Logos website and marketing appeal.

      154.    On November 16, 2023, Mr. Knowlton emailed Mr. Barba at his Corvallis

Custom email address, asking him to send a link to the Google Drive to a contact person at

Brands and Logos' SEO company.  Mr. Barba responded later that day stating that he added the

contact person to the Google Drive and would let her know every time he uploaded something to

the drive.  Mr. Barba was taking pictures of Brands and Logos' prior work to go on Brands and

Logos website and social media accounts, for the purposes of marketing Brands and Logos.

Mr. Barba did not inform Mr. Freeby that he was doing this marketing work for Brands and

Logos, and Mr. Freeby did not learn of this until after Mr. Barba left his employment with

Corvallis Custom and returned his work computer.  The court finds that this is two instances of

competition because Mr. Barba gave access to the Google Drive to Brands and Logos' SEO

company and because Mr. Barba was taking pictures to use on Brands and Logos website and

social media.

      155.    On November 22, 2023, Mr. Knowlton emailed Mr. Barba at his Corvallis

Custom email address with a photo, description, and price of a screen-printing machine, asking

Mr. Barba if the machine could be expanded to more colors.  Mr. Barba responded that it was the

same machine that Corvallis Custom had in its warehouse, just two years older.  Mr. Barba did not inform Mr. Freeby about this inquiry and Mr. Freeby did not learn of this until after Mr. Barba left his employment with Corvallis Custom and returned his work computer.  The court finds that this is one instance of competition because Mr. Barba provided information about the capability of equipment to Brands and Logos.

156.     On December 12, 2023, Mr. Barba sent an email from his personal email address to Mr. Knowlton with a copy of the marketing plan he did for Corvallis Custom in 2019 as a school project.  Mr. Knowlton did not receive this particular email because there was an error in the email address (.com used instead of .net).  Mr. Barba admits he intended Mr. Knowlton to receive this plan.  Mr. Knowlton admits that he has reviewed this plan.  Mr. Barba sent this marketing plan to Mr. Knowlton while Mr. Barba was an employee on the payroll of Corvallis Custom.  Mr. Barba did not inform Mr. Freeby that he was providing this information to Brands and Logos, and Mr. Freeby did not learn of this until after Mr. Barba left his employment with Corvallis Custom and returned his work computer.  The court finds that this is one instance of competition because Mr. Barba provided marketing information to Brands and Logos regarding its competitor Corvallis Custom.

157.     On December 14, 2023, Mr. Barba sent an email from his personal email address to Mr. Knowlton with a link to the website where Brands and Logos could become licensed to produce goods for colleges and listed six specific colleges.  Mr. Knowlton admitted Brands and Logos was trying to become a licensee at that time, and that Mr. Barba was providing information about Corvallis Custom's customers.  Mr. Knowlton was worried that Brands and Logos would be sued because it did not have its own license to produce goods for these college customers.  Mr. Barba sent this email while he was an employee on the payroll of Corvallis Custom.  Mr. Barba did not inform Mr. Freeby that he was providing this information to Brands and Logos, and Mr. Freeby did not learn of this until after Mr. Barba left his employment with Corvallis Custom and returned his work computer.  Mr. Barba testified that he informed Mr. Freeby that he sent this, but the court did not find that testimony credible.  The court finds

that this is one instance of competition because Mr. Barba provided licensing information to Brands and Logos to assist it in competing with Corvallis Custom.

158. On December 19, 2023, one of Corvallis Custom's vendors reached out to Mr. Freeby, Ms. Freeby, and Mr. Barba to ask if they were going to be at the Long Beach trade show in January 2024. Ms. Freeby responded on behalf of all of them that they would not be at the trade show but would reach out to coordinate plans for backstock. Later that day, Mr. Barba, while working for Corvallis Custom, responded separately to the vendor (without copying Mr. or Ms. Freeby) saying that he would be at the trade show "with my team" and suggested catching up. Mr. Barba did not tell Mr. Freeby about this encounter. The court finds that this is one instance of competition because Mr. Barba, while working for Corvallis Custom, contacted one of its vendors on behalf of Brands and Logos.

159. On December 20, 2023, Mr. Barba sent an email from his personal email address to Mr. Knowlton with a list of equipment that he wanted for his upcoming work for Brands and Logos. Mr. Knowlton did not receive this particular email because there was an error in the email address (.com used instead of .net). Mr. Barba admits he intended Mr. Knowlton to receive this email regarding equipment. Mr. Barba did not disclose this email to Mr. Freeby, even though Mr. Barba still worked for Corvallis Custom at this time. The court finds that this is one instance of competition because Mr. Barba was attempting to prepare for working on behalf of Brands and Logos while he was still working for Corvallis Custom.

160. At trial, Mr. Knowlton testified that he regularly consults with his competitors and that he and his competitors regularly do favors for each other. The court did not find that testimony to be credible.

#### 4. Mr. Barba Was Rewarded by Mr. Knowlton and Brands and Logos

161. On January 13, 2023, Mr. Knowlton emailed Mr. Barba at his Corvallis Custom email address a photograph of a table with cash on it, saying "Just won."

162.    On March 12, 2023, Mr. Barba emailed Mr. Knowlton to ask him to do an order for him, using art for Mr. Barba's personal brand.  Mr. Knowlton asked what the art would go on, and Mr. Barba replied it would go on a foam trucker hat or standard five-panel hat. Mr. Knowlton did not know if he ever billed Mr. Barba for that work.  Mr. Barba should have put this project in the Printavo system because he was using one of Corvallis Custom's vendors, Brands and Logos, at Corvallis Custom's contract rate with that vendor.  Corvallis Custom has no record that Brands and Logos ever billed Corvallis Custom for this work.  The hat was made, because an image of someone wearing this hat was posted on Mr. Barba's Born Bad brand Instagram page.

163.    On July 24, 2023, Mr. Knowlton emailed Mr. Barba with an advertisement for an auction of a motorbike in a storage facility.  Mr. Knowlton used to engage in purchasing contents of storage facilities at auction to re-sell the contents.  Mr. Barba enjoyed racing motorbikes. According to Mr. Barba's bankruptcy schedules, Mr. Barba owned a motorbike when he filed bankruptcy.

164.    On August 8, 2023, Mr. Barba emailed Mr. Knowlton with a logo for Mr. Barba's personal brand, Born Bad, saying that he was "[g]oing to want big like 10 in."  At his deposition, Mr. Knowlton claimed he did not remember why Mr. Barba sent this message or whether Mr. Barba was asking him to produce anything.  At trial, Mr. Knowlton claimed that he was going to embroider that logo on something for Mr. Barba, in exchange for Mr. Barba helping him around his house and yard.  Corvallis Custom's Printavo system contained no information on this order.  Because Born Bad was a customer of Corvallis Custom, Mr. Barba should have followed the regular process for producing an order through Corvallis Custom but did not.

165.    On August 15, 2023, Mr. Barba emailed Mr. Knowlton with four logos for Mr. Barba's personal brand, Born Bad, saying what he wanted on the front and right side of a hat.  Corvallis Custom's Printavo system contained no information on this order.  Because Born Bad was a customer of Corvallis Custom, Mr. Barba should have followed the regular process for producing an order through Corvallis Custom but did not.

166.    On September 11, 2023, Mr. Barba emailed Mr. Knowlton with another logo for Mr. Barba's personal brand, Born Bad.  Corvallis Custom's Printavo system contained no information on this order.  Because Born Bad was a customer of Corvallis Custom, Mr. Barba should have followed the regular process for producing an order through Corvallis Custom but did not.

167.    On October 2, 2023, Mr. Barba emailed Mr. Knowlton regarding a golf bag with a logo comprised of Oregon State University's "Old School Benny" logo and the name J. Wokhart. Mr. Knowlton responded later that day asking for the font names for the lettering.  Mr. Barba said he would need to look the next morning.  On October 3, 2023, Mr. Barba sent Mr. Knowlton a zip file entitled "arando_script."  Mr. Knowlton claimed he did not know why Mr. Barba sent this information to him.  The court did not find that claim credible.  The court finds that this is two instances of improper disclosure because Mr. Barba provided the "Old School Benny" logo and font files to Mr. Knowlton and Brands and Logos.

168.    On October 6, 2023, Mr. Barba posted on his personal social media an image of Old School Benny being embroidered by a commercial embroidery machine onto a bag. Mr. Knowlton testified he could not identify in the image if that was Brands and Logos' embroidery machine, but the court did not find that testimony credible.

169.    When Mr. Freeby saw this image on Mr. Barba's social media, he told Mr. Barba to remove it immediately.  Old School Benny is a vaulted logo that Oregon State University authorizes Corvallis Custom to use, but only at specific limited times of year.  Corvallis Custom could not lawfully have produced this golf bag for Mr. Barba at that time.  At the time, Brands and Logos had no license directly with Oregon State University.  Mr. Barba's direct request to Brands and Logos to have Old School Benny embroidered onto a golf bag for himself was a violation of Oregon State University's rights.

170.    On October 15, 2023, Mr. Knowlton emailed Mr. Barba at his Corvallis Custom email address with a flight itinerary for a flight Mr. Knowlton purchased for Mr. Barba to travel to Orange County, California, the next day.

5.       **Mr. Knowlton Knew Corvallis Custom Had Non-Compete and Non-Disclosure Agreements With its Employees and Did Not Care**

171.    Mr. Knowlton knew that Mr. Barba had a non-compete agreement with Corvallis Custom, but Mr. Knowlton thought it was "worthless."

172.    This was not the first time that an employee left Corvallis Custom to go work for Brands and Logos.  Mr. Saboorizadeh had previously left Corvallis Custom to work for Brands and Logos.  Mr. Freeby talked to Mr. Knowlton about that, and about Mr. Saboorizadeh's non-compete and non-disclosure agreement.  Mr. Freeby told Mr. Knowlton that Corvallis Custom would not continue to work with Brands and Logos if it was hiring away Corvallis Custom's employees.  Mr. Knowlton said this was a one-time event and would not happen again.  Mr. Freeby felt the issue was resolved with Mr. Knowlton, and felt sorry for Mr. Saboorizadeh, so he did not take further action at that time.

173.    On November 28, 2023, Mr. Barba sent an email from his personal email address to Mr. Knowlton with copies of four documents relating to Mr. Saboorizadeh.  Mr. Barba commented: "He removed all documents from the nas [Corvallis Custom's server] – sending this from my email so there is no record.  Only [F]rankie has these forms in his files."  At trial, Mr. Barba testified that he was sending these documents to Mr. Saboorizadeh, who used the Brands and Logos email address.  That testimony was not credible, particularly given that the message states that Mr. Saboorizadeh already had these forms in his files.  Mr. Barba did not inform Mr. Freeby that he was providing this information to Brands and Logos, and Mr. Freeby did not learn of this until after Mr. Barba left his employment with Corvallis Custom and returned his work computer.  The court finds that this is four instances of improper disclosure because Mr. Barba provided four documents to Mr. Knowlton and Brands and Logos.

174.    On December 11, 2023, Mr. Knowlton responded by sending Mr. Barba a link to the Oregon Bureau of Labor and Industries' website on non-competition agreements.  The link showed what was needed for a non-compete agreement to be enforceable in Oregon.  Mr. Barba testified that he did not receive this as a future employee of Brands and Logos, but instead that

Mr. Knowlton was a friend sending him this information for his meeting with Mr. Freeby.  This testimony was not credible.  Mr. Knowlton was sending this information to Mr. Barba so Mr. Barba could use it to evade his obligations to Corvallis Custom and come work for Brands and Logos.

**B.      While at Corvallis Custom, Mr. Barba Took Product and Services**

175.    From April 9, 2021, through December 18, 2023, Mr. Barba ordered and made numerous items at Corvallis Custom for himself and his various personal projects.  For these orders, in the Corvallis Custom Printavo system, Mr. Barba either marked these as paid in cash or by "other," or to be paid in the future, or altered the invoice and payment records to set the amount due to $0.00.  In fact, Mr. Barba did not pay for these items, except for $52.50 paid toward one invoice, and $899.68 paid toward another invoice.  The retail value of these unpaid goods was $19,420.41.

176.    Mr. Barba had numerous excuses at trial for his failure to pay for these goods.  Mr. Barba contended that some of these items were made to be samples for use by Corvallis Custom, or as tests of new merchandise from SanMar, or as part of doing research and development on Corvallis Custom's new DTF printer.  Mr. Barba also asserted that he paid for other items "in trade."  Mr. Barba claimed that by making products for his own personal brand he was developing future business for Corvallis Custom.  The court did not find any of this testimony to be credible.

177.    Mr. Barba did not need merchandise with his own personal Born Bad brand on it to use as samples for Corvallis Custom.  Corvallis Custom already had sample product.

178.    Mr. Barba also testified that employees were allowed to work extra hours and take their payment in the form of product.  Mr. Freeby denied this arrangement existed.  The court did not find Mr. Barba's testimony credible.

179.    Mr. Barba did work for 858 Bullies in exchange for receiving a dog.  Mr. Barba claimed that 858 Bullies was not a Corvallis Custom customer, because Mr. Barba was paying

for the work.  Mr. Barba also claimed the items he provided for 858 Bullies were for a sponsorship and that he paid for the goods.  The court did not find this credible—the work was for a friend of his from whom Mr. Barba obtained one of his dogs.

180.    Corvallis Custom did not authorize a sponsorship for 858 Bullies, which was in California.  Mr. Freeby did not know about the alleged sponsorship until Mr. Barba testified about it at trial.  Mr. Freeby testified that it would not have made sense for Corvallis Custom to sponsor something in California.

181.    Mr. Barba contended at trial that he should be responsible only for paying for the cost of the items he took, not the retail value.  Because Corvallis Custom charged its employees retail value unless Mr. Freeby authorized a specific discount (which he did not do for these items), Mr. Barba should have paid the retail value for these goods.

182.    Failure to pay for these goods was the basis for the criminal charges against Mr. Barba, for which he was convicted after he pleaded no contest.

### C.    While At Corvallis Custom, Mr. Barba Did Free Work for His Friends

183.    Mr. Barba claimed that he did work for Trysting Tree Golf Club as a sample, to try to get work from Trysting Tree.

184.    Trysting Tree did not order from Corvallis Custom in 2023.  However, Corvallis Custom, through Athlete Zone, did work that involved the Trysting Tree Golf Course.

185.    Mr. Camacho would create artwork for Endzone Studios and share that artwork with Mr. Barba to obtain Mr. Barba's opinion.  Mr. Barba created mockups with variations of the artwork provided by Mr. Camacho.  Mr. Camacho worked with Mr. Barba on his artwork and designs while Mr. Barba worked for Corvallis Custom.

186.    Corvallis Custom vectorized Endzone Studios' logo.

187.    Mr. Barba claims he did work for Trysting Tree and Endzone Studios to present samples to potential customers.  He also claimed he did not know that Endzone Studios was using another screen printer.  Mr. Barba said that he did the artwork for Mr. Camacho's Endzone

Studios store front and Trysting Tree on his own time and not through Corvallis Custom.  The court did not find this testimony credible.

188.    In connection with Trysting Tree and Endzone Studios, Mr. Barba claimed he was interested in taking someone else's high value clients.  The court found this testimony credible.

189.    Mr. Camacho testified at trial that he did not obtain quotes from Corvallis Custom.  The court did not find this credible.  In a prior declaration, Mr. Camacho testified that he never purchased vectorized files from Corvallis Custom as their cost was higher than industry standard.  The only way he would know the cost was if he had obtained a quote.

190.    Mr. Camacho testified that he planned to do a t-shirt for a grand opening event for Endzone Studios in April 2023, but ended up not doing it.

191.    Mr. Barba did not charge Mr. Camacho's business for any work that Mr. Barba did for Endzone Studios while Mr. Barba was at Corvallis Custom.

## V.    Mr. Barba Gives Notice of Intent to Leave Corvallis Custom to Become a Partner in Brands and Logos

192.    On November 16, 2023, Mr. Barba gave notice to Mr. Freeby and Corvallis Custom that his last day would be December 23, 2023.  He stated in his written resignation notice that "an exciting opportunity has unfolded in Keizer" and that he was transitioning "toward a partner role."  Mr. Barba testified that he meant that he would remain a partner with Athlete Zone as part of his work as an independent contractor with his own marketing company, Wokstar Media.  The court did not find Mr. Barba's testimony credible.

193.    When Mr. Barba announced he was leaving on November 16, 2023, he followed that up with a conversation with Mr. Freeby.  Mr. Freeby testified that Mr. Barba told him that Mr. Barba was offered a partnership in Brands and Logos.  Mr. Barba did not say he was going to be an independent contractor for Brands and Logos.  The court found this testimony credible.

194.    Mr. Freeby talked to Mr. Barba about the November 16, 2023, letter.  Mr. Barba told Mr. Freeby that he would be a partner with Mr. Knowlton.  Mr. Barba said that at Corvallis Custom, he was a big dog being treated as a little dog, and was chained.  Mr. Freeby did not

immediately fire Mr. Barba because he trusted Mr. Barba, had invested a lot in training Mr. Barba, did not yet know about Mr. Barba's actions, and did not want to fire someone shortly before Christmas.

195.    At that time, Mr. Knowlton stated he intended to hire Mr. Barba to do marketing and sales for Brands and Logos.  He testified that he had not offered an ownership interest in Brands and Logos to Mr. Barba.  Mr. Knowlton testified that he did not intend to hire Mr. Barba as an employee, only as an independent contractor.  The court did not find that testimony to be credible.  When asked, Mr. Knowlton could not even name Mr. Barba's alleged marketing company.  Instead, the court finds that as of November 16, 2023, Mr. Knowlton intended to bring Mr. Barba into the Brands and Logos at least as a key employee and potential owner.

196.    On November 28, 2023, Corvallis Custom's attorney Timothy Crawley sent a letter to Mr. Barba and Mr. Knowlton regarding Mr. Barba's intentions to leave Corvallis Custom to take an equity position with Brands and Logos.  The letter described Mr. Barba's Nondisclosure Agreement and Non-Compete agreement and included copies of those agreements.  Corvallis Custom asserted its intent to enforce those agreements.  Mr. Barba asserted that Mr. Freeby told him that Mr. Crawley was not authorized to send the letter.  The court did not find that testimony credible.

197.    On or about December 11 and 12, 2023, Mr. Freeby, Mr. Knowlton, and Mr. Barba had one or more meetings to try to resolve matters relating to Mr. Barba leaving Corvallis Custom with the intention to work for Brands and Logos.  Mr. Knowlton told Mr. Freeby that Mr. Barba would be doing only marketing for Brands and Logos.  At the time, Mr. Freeby was unaware that Mr. Barba had removed anything from Corvallis Custom or had provided free work to Brands and Logos in competition with Corvallis Custom.  Mr. Freeby still believed that Brands and Logos was doing no work for retail customers.

198.    On December 12, 2023, Mr. Freeby sent proposed agreements to Mr. Barba and Mr. Knowlton.  Under those proposed agreements, Brands and Logos would be required to have an exclusive arrangement to do all its screen-printing and non-embroidery work using Corvallis

Custom, and Corvallis Custom would use Brands and Logos for all its embroidery. Brands and Logos would not be allowed to solicit Corvallis Custom's customers. Mr. Knowlton did not want to sign these agreements because he did not think they were fair.

199.    On December 14, 2023, Mr. Barba sent comments asking for some revisions to the terms of the proposed agreements. Mr. Barba wanted to be released from his Non-Disclosure Agreement and Non-Compete agreement with Corvallis Custom so he could go work with Brands and Logos. Although Mr. Freeby thought they had reached agreement, ultimately, Brands and Logos refused to sign the agreements. At that point, Corvallis Custom stopped using Brands and Logos to do embroidery work.

## VI.    Mr. Barba Works at Brands and Logos as an Employee with the Intent of Becoming an Owner

200.    On December 28, 2023, Brands and Logos emailed Mr. Barba a QuickBooks link to set Mr. Barba up as an employee, so that he could view pay stubs, W-2 information, and more.

201.    By no later than March 2024, Mr. Barba was living with Mr. Knowlton, David Knowlton, and Grace Knowlton. Mr. Barba told counsel for Corvallis Custom in writing that the Rickman Road property in Keizer was his abode since March 2024. On April 25, 2024, Mr. Barba sent an email to counsel for Corvallis Custom, saying that he was "left utterly perplexed by your deliberate failure to serve me in Keizer-despite your unwavering knowledge of my whereabouts." On his bankruptcy petition, Mr. Barba asserted that he lived at the Keizer property on Rickman Road.

202.    In May 2024, Mr. Barba became the director of operations for Brands and Logos.

203.    In his deposition, Mr. Barba testified that he has worked as the director of operations for Brands and Logos since the start of 2024.

204.    Mr. Barba testified at his meeting of creditors that he was always an employee of Brands and Logos, but Brands and Logos wanted to treat him as an independent contractor.

205.    In 2024, Mr. Barba's LinkedIn page included the following post from Mr. Barba: "[c]urrently, I own and operate my own manufacturing facility . . ."  Mr. Barba admitted that he made this statement to build his credibility.

206.    On May 29, 2024, Mr. Barba posted on his Facebook account that he was "[b]uilding my studio from scratch and bringing you all along for the ride.  From 20-24, I took a subpar printing shop and turned it into a vibe and producing top notch quality – I got tired of the anchors, cut that weight off my back n now it's go time, AGAIN."

207.    On June 11, 2024, Mr. Barba posted on his Instagram account "Laser unboxing?! Come see the newest piece of equipment I'm putting into the studio . . . we've got her up and running now but this investment is going to be a game changer."  The post went further, with Mr. Barba stating "@luke_esclanar has taken over editing and I'm blessed to have him in the team!"

208.    Another time in 2024, Mr. Barba posted on his Facebook account that "[a]t 25 I'm building my print shop and consulting business . . . [d]o me a favor and check out my website and give feed back: brandsandlogos.net."  Mr. Barba testified that he likes to present himself as bigger than he really is.  Mr. Barba said he was an employee of Brands and Logos, but because he was a partner in the success of Brands and Logos, he assumed that he could say the Brands and Logos website was his.

209.    Mr. Barba testified at trial that he worked for Brands and Logos as an independent contractor doing marketing from January 2024 to May 2024, and then received an employment offer from Brands and Logos in May 2024.  The court did not find this testimony credible.

210.    At his meeting of creditors, Mr. Barba testified to the bankruptcy trustee that he had not been self-employed in the last six years.

211.    When Mr. Barba left Corvallis Custom, Mr. McCoy believed that Mr. Barba was starting his own group.

212.    Specifically, the court finds that Mr. Barba left Corvallis Custom in December 2023 and started working at Brands and Logos with the intent of being an owner in Brands and Logos.

213.    Mr. Barba said he took the job with Brands and Logos in May 2024 because he needed the cash flow to pay his rent.  The court did not find this testimony credible.  Mr. Barba had been living on and off with Mr. Knowlton and Mr. Knowlton's parents at the Keizer property on Rickman Road, with no obligation to pay rent in May 2024.

214.    Mr. Barba denies that ownership of Brands and Logos or DGK was ever promised to him.  The court did not find that testimony credible.

**VII.    Before Leaving Corvallis Custom, Mr. Barba Stole its Key Computer Files**

215.    On December 12, 2023, Mr. Barba uploaded a zip file (the "BB_2023" file) containing information from Corvallis Custom's server to his personal Dropbox account.  The archive was 41.5 GB in size and contained 2,969 files from various places on Corvallis Custom's server.

216.    Mr. Freeby personally did the analysis of what files Mr. Barba took from Corvallis Custom.  Although Mr. Freeby did not hire a forensic analyst to do this work, Mr. Freeby personally manages the computers and server for Corvallis Custom and was easily qualified to identify Corvallis Custom's files in the Dropbox account.  Mr. Freeby testified that only he and Mr. Barba could access all these files at Corvallis Custom (and that not even Ms. Freeby could do so).  Mr. Barba provided no evidence that Mr. Freeby tampered with or inaccurately identified the files in the Dropbox (although Mr. Freeby did use a highlight tool to indicate specific files in the screenshots for purposes of presenting evidence).

217.    The files Mr. Barba took and put in the Dropbox were everything necessary to produce work for customers, and included client and customer data, Corvallis Custom's marketing plan, social media strategies (including information on Corvallis Custom's use of hashtags), training materials, strategic documents, information the art department used to create print ready DTF files, templates of various kinds used to produce customer artwork, apparel tags,

end products, a customized version of the Roland color library calibrated to Corvallis Custom's printers and DTF machines (a critical file, because all of the DTF files are calibrated to this color library), and the machine registration and calibration templates for Corvallis Custom's ROQ automatic screen-printing machine.  Mr. Barba took specific materials relating to customers including the Pac-12 conference, Oregon State University (including materials relating to its equipment director for all sports and the print ready file for the "Beveled Benny Patch"), and athlete Alton Julian.

218.    The BB_2023 archive included files for Corvallis Custom's customers, including Oregon State University athletics and Project ESC, as well as files that Mr. Barba asserted he was working on for some of his friends and his own personal projects.

219.    Mr. Barba took print-ready files for customers.  Mr. Barba took all of Corvallis Custom's images from its website.  Mr. Barba took the athlete agreement for Athlete Zone.

220.    Mr. Barba also took files that belonged to Corvallis Custom and had them on two personal Google Drives and an Adobe Creative Cloud drive that Mr. Barba opened in his girlfriend's name so that he could use her student discount when he was no longer in school. These files included work for Corvallis Custom's customer Endzone and Corvallis Custom's customized Roland color system library.

221.    Mr. Barba admitted he took files from his Corvallis Custom desktop computer in November or December 2023 and downloaded or exported them to a personal USB drive that he owned.

222.    Mr. Barba later destroyed the personal USB drive, stating that he was required to do so by the preliminary injunction issued by the state court.  Mr. Barba testified that he destroyed those files with his lawyer, at the direction of his lawyer.  Mr. Barba has multiple lawyers.  Mr. Barba could not remember which lawyer did this.  The court does not find it credible that any of Mr. Barba's lawyers advised him to destroy evidence while both civil and criminal litigation was actively pending.

223.    Although Mr. Barba testified that the only files he took and put on his personal USB drive were files relating to his Born Bad brand, it is impossible to determine if that was true because Mr. Barba destroyed the USB drive.

224.    Mr. Barba did not at any time have permission from Corvallis Custom to move, copy, or take any files from Corvallis Custom's server.

225.    Corvallis Custom discovered Mr. Barba's theft of its computer files only after Mr. Barba returned his work computer to Corvallis Custom in January 2024

226.    Mr. Barba asserted that the files in the Dropbox were part of an automatic backup process that ran every 3 or 4 days, and that he did not intentionally move anything to a Dropbox. The court did not find that testimony credible.  The files that Mr. Barba took were not a mere automatic backup.  The files in the Dropbox were zipped, which Mr. Freeby testified credibly would require manual action to do under Corvallis Custom's computer setup.  Mr. Barba needed to pick and pull those files to build a folder and then manually zip it.  The files in the BB_2023 file were pulled from all over Corvallis Custom's server.

227.    Mr. Barba claimed that the BB_2023 file contained Corvallis Custom's customer information because he inadvertently saved files in the wrong place or saved them intentionally so they would be convenient to him to use remotely.  He claimed not to know what some of the Oregon State University files were, including the Oregon State University Tagged Customer list. The court did not find any of this testimony credible.

228.    Mr. Barba testified that he created the BB_2023 zip file in 2021 and would roll it over every year and rename the file.  Mr. Barba testified that he did this so that he could conveniently work remotely.  The court did not find this testimony credible.

229.    Mr. Barba claimed that he put the template files in the BB_2023 zip file because he was always improving them, for convenience, and so they would be available so he could design his own projects.  The court did not find this testimony credible.

230.    The court finds Mr. Barba took these documents to use at Brands and Logos.

231.    After reviewing the evidence presented about the computer files that Mr. Barba took from Corvallis Custom and either included in the BB_2023 file, copied to his personal Dropbox, copied to one of his two personal Google Drives, or copied to the Adobe Creative Cloud drive that Mr. Barba opened in his girlfriend's name, the court finds that there are at least 71 instances of improper disclosure of Corvallis Custom's computer files.

232.    In counting these instances of improper disclosure, the court included print ready and vector files for Corvallis Custom's customers, template files, marketing files, the customized Roland color library, the Athlete Zone agreement, and similar files.  The court included some files, such as the Roland color library, even if they were initially publicly available, because the evidence showed they had been customized for Corvallis Custom's use.  The court did not count files for Mr. Barba's Born Bad brand, files that Mr. Barba prepared for Mr. Knowlton and Brands and Logos, files that Mr. Barba prepared for his friends and personal projects, files for Frankie Saboorizadeh, temp files, or thumbnails.

233.    The court acknowledges the evidence that Mr. Barba took 2,969 computer files and that he also copied computer files to a personal USB drive.  For some computer files, the evidence showed specific computer files were taken.  For other files, the evidence showed only a folder containing computer files, but not what specific files were inside the folder.  For those folders not showing what specific files were inside the folder, the court did not have sufficient specific evidence to show what all those computer files in the folders were.  Therefore, the court could not evaluate the extent to which a disclosure of those specific files was improper or whether to include or exclude them from the count above.  As a result, the court generally did not count the folders.

234.    However, the count above does include the folder for the Beveled Benny Patch as one instance of improper disclosure, because nobody other than Corvallis Custom had the right to produce anything using any files for the Beveled Benny Patch.  The count also includes the folder for the Pac-12 files as one instance of improper disclosure, because Mr. Barba acknowledged that the folder contained the Pac-12 logo file.

**VIII.  Before Leaving Corvallis Custom, Mr. Barba Told One Customer to Stop Working with Corvallis Custom**

235.    Keilah Early was an active customer of Corvallis Custom.  Corvallis Custom did fulfillment work for Ms. Early's ecommerce store.  On December 21, 2023, two days before Mr. Barba left Corvallis Custom, Mr. Barba emailed Ms. Early and told her "I cannot accept any more jobs after this, so close down your website."  Mr. Barba testified that he meant she should just stop orders over the holiday break, but the court did not find that credible.  The court finds that this is one instance of competition because Mr. Barba was attempting to dissuade a Corvallis Custom customer from sending orders to Corvallis Custom as he was leaving for Brands and Logos.

**IX.  Mr. Barba Leaves Corvallis Custom – But Returns to Take Items**

236.    Mr. Barba's last day of work at Corvallis Custom was December 23, 2023.  Mr. Freeby took Mr. Barba to lunch on his last day of work.  Mr. Freeby testified that at lunch he asked for Mr. Barba's keys and laptop.  Mr. Barba turned in his laptop computer, but Mr. Barba said he had forgotten the keys and would bring them back after the winter break.  Mr. Barba testified that Mr. Freeby did not ask him for the keys, which the court did not find credible.

**A.  ESC Hats**

237.    On Sunday morning, December 24, 2023, the surveillance camera in Corvallis Custom's shop captured a video of Mr. Barba coming into the shop, removing hats from a closed glass display case, and leaving the shop.  Corvallis Custom's shop was closed at this time and Mr. Barba had no authority to be there or remove anything, including any hats.  Mr. Barba used the key he had not returned.

238.    Mr. Barba claimed he took beanie-style hats and product he made for himself, but the video shows him removing baseball-style hats.

239.    In or around June 2023, Mr. Escanlar's business, ESC placed an order with Corvallis Custom for hats and shirts.  On June 26, 2023, Mr. Knowlton emailed Mr. Barba at his Corvallis Custom email address with the incorrect logo for ESC.  The hats were initially

embroidered with the wrong logo.  Corvallis Custom made replacement hats that were delivered to ESC, along with a credit toward a future purchase.  ESC used the credit for the purchase of a banner from Corvallis Custom.

240.    Corvallis Custom did not deliver the hats with the wrong logo to ESC.  Instead, it kept the hats in its showroom.  In January 2024, Mr. Freeby could not find these hats in the showroom.

241.    Mr. Escanlar denies that he or ESC received the hats with the wrong logo.

242.    After Mr. Barba was no longer employed at Corvallis Custom, Mr. Barba made a social media post dated "Jan 16" with a photo of himself wearing one of the hats with the wrong ESC logo.  The hat is a baseball-style hat.  Mr. Barba texted a screenshot of that media post to Mr. Escanlar.

243.    Mr. Barba took the hats embroidered with the wrong logo from Corvallis Custom.

**B.    Other Items Mr. Barba Took**

244.    On December 26, 2023, Corvallis Custom's surveillance camera captured footage showing Mr. Barba entering Corvallis Custom's office at 7:12 p.m. while the office was closed and the lights were off.  Mr. Barba is wearing a hoodie pulled over his head.  In the video, Mr. Barba opens and rummages through boxes of brand-new apparel and takes stuff out of packages.  He goes over to the area of his former desk that is not shown on video, comes back into view, and then exits.  Mr. Barba has something in his hoodie pocket when he leaves.  Mr. Barba claims he was looking for apparel that he ordered for himself and did not take anything, but the court did not find that testimony credible.

245.    On January 10, 2024, Corvallis Custom's surveillance camera captured footage showing Mr. Barba entering Corvallis Custom's office at 11:08 p.m. while the office was closed and the lights were off.  Mr. Barba is wearing a hat and a jacket with his personal "Born Bad" logo on it.  He walks into the room, takes a large box, and leaves.  Mr. Barba admitted that he did not wait for Corvallis Custom to open at its normal business hours to come take this box.

Mr. Barba claimed this large box was a personal delivery of dog food from Chewy.  The court is skeptical of this claim because there was no logo for Chewy or any dog food brand on the box.

246.    Mr. Freeby testified that he reviewed video surveillance footage showing Mr. Barba removing a small refrigerator from Corvallis Custom's warehouse and inventory from a shelf.

247.    After Mr. Barba stopped working for Corvallis Custom, Mr. Barba had no permission from Corvallis Custom to be on Corvallis Custom's premises or to take anything from its offices or warehouse.

248.    Mr. Barba used the keys he had not yet returned to Corvallis Custom to enter the premises.

249.    Mr. Barba claimed that he was not asked to return these keys.  The court does not find this testimony credible.

250.    Mr. Barba eventually returned his key for Corvallis Custom to Mr. Butler, who delivered it to Mr. Freeby.

## X.    Mr. Barba Works for Brands and Logos and Mr. Knowlton, Using Corvallis Custom's Confidential Information

251.    Mr. Knowlton denied at length that Brands and Logos used any of Corvallis Custom's files or confidential information.  The court did not find this testimony credible.

252.    Mr. Escanlar denies that Brands and Logos or Mr. Barba used any of Corvallis Custom's files, hashtags, or marketing material.  The court did not find that testimony to be credible.

### A.    Use of Corvallis Custom's Information for Oregon State University

253.    Brands and Logos did at least $15,000 of work for Oregon State University in 2024.

254.    Mr. McCoy provided work on behalf of Oregon State University to Mr. Barba at Brands and Logos.

255.    Brands and Logos produced product for Oregon State University athletics for the Pac-12 wrestling tournament in early 2024.  Mr. McCoy denied that he worked on that project.

256.    Brands and Logos was not licensed to produce work for Oregon State University athletics in early 2024.  Mr. McCoy claimed he did not know that.

257.    Mr. Barba create an invoice on Brands and Logos' Printavo system for work for Oregon State Athletics on February 26, 2024, for the Pac-12 wrestling championship.  The project included a Pac-12 logo.

258.    Mr. Barba took Pac-12 print files as part of the BB_2023 files.

259.    On or about February 26, 2024, Brands and Logos produced sweatshirts for the Oregon State University Athletics wrestling team for the Pac-12 championship.  Mr. Barba handled the order for Brands and Logos.

260.    Mr. Knowlton testified that Brands and Logos did not need a license to produce these sweatshirts for Oregon State University because Brands and Logos did not use any Oregon State University marks on these sweatshirts but only the Pac-12 logo, for which he did not need permission.  The court did not find that testimony to be credible.

261.    Before Mr. Barba's theft of information and materials from Corvallis Custom, Brands and Logos did not have a license to produce for Oregon State University.  As of December 17, 2024, Brands and Logos had acquired a license to produce work for Oregon State University.

262.    Corvallis Custom produces a certain specific product called the Beveled Benny Patch, which is a PVC patch, for Oregon State University.  Corvallis Custom is the only company authorized to produce this design.

263.    Mr. Barba believed that the Beveled Benny would not have been created without him, because Corvallis Custom would not have "gotten the play" without him.

264.    While working for Brands and Logos in 2024, Mr. Barba posted a video showing him making deliveries for Brands and Logos, wearing a hat with the Beveled Benny Patch on the front of it and "Brands and Logos" embroidered on the side of it.  Corvallis Custom did not sell a

hat with a Beveled Benny Patch to Mr. Barba, nor did it authorize Brands and Logos to produce that hat.  Mr. Barba wore this hat to make deliveries to Oregon State University.

265.    Mr. Barba testified he obtained the specific patch on his hat from Mr. Castro in the Oregon State University athletics department, and that he did new artwork in 2024 at Brands and Logos to make more PVC patches for Oregon State University.  The court did not find that testimony to be credible.

266.    In September 2024, Mr. Westbrook texted Mr. Barba to ask about obtaining PVC patches and wanted to know the minimum quantity.  Mr. Barba responded that it was 50.

267.    Mr. Camacho worked with Brands and Logos to obtain t-shirts for the University of Oregon/Oregon State University "civil war" game, for a couple thousand dollars in 2024 and 2025.

268.    Corvallis Custom worked on the logo for the 2023 Maui Classic, a women's basketball tournament.  In 2024, Mr. Barba did the work for the Maui Classic at Brands and Logos.  Mr. McCoy testified that he was not involved in that project.

269.    In late December 2024, Mr. Barba made a social media post about shirts that Brands and Logos made for the Oregon State University women's basketball team for the Maui Classic.  Brands and Logos bragged that the company did the work to produce the shirts even though it had only four days to do so.  The shirts were identical to shirts that Corvallis Custom had previously made for the Oregon State University women's basketball team.

270.    Mr. Knowlton testified that Brands and Logos created the shirts in-house, needed to change the date on the shirts, and did not use Corvallis Custom's information to produce the shirts.  The court does not find that testimony credible, given that the shirts in the photo are undated and Mr. Knowlton could not recall who he used to do the vectoring for the design.

271.    Mr. Barba testified that he obtained the artwork for the Maui Classic shirts from Hope Anderson at Oregon State University and that he sent that artwork out to a vendor to vectorize.  The court did not find this testimony credible.

272.    Mr. Freeby testified that the design for the Maui Classic shirt was stolen from Corvallis Custom, testimony that the court does find credible.

273.    Mr. Barba was able to do the work for the Maui Classic in only four days because he had information about the requirements for the project from his time working for Corvallis Custom and he used Corvallis Custom's work product.

**B.    Use of Corvallis Custom's Information for Other Customers**

274.    When Mr. Barba left Corvallis Custom and took the BB_2023 files, those files included print-ready files for Trysting Tree, Endzone Studios, and ESC.

275.    Trysting Tree ordered from Brands and Logos in 2024 and 2025.

276.    Brands and Logos has done work for Endzone Studios. Endzone Studios was not a customer of Brands and Logos before Mr. Barba left Corvallis Custom but became a customer thereafter.

277.    ESC has ordered product from Brands and Logos approximately five times.

**C.    Use of Corvallis Custom's Other Business Information**

278.    On December 24, 2023, Mr. Knowlton sent an email to Mr. Barba at his personal email address with a link to a Facebook marketplace post and a description of two ROQ screen printing machines for sale. The purpose of this email appears to be to seek Mr. Barba's opinion on these machines. That inquiry would make no sense if Mr. Barba was going to be doing only marketing for Brands and Logos as an independent contractor and Brands and Logos had no interest in acquiring a ROQ screen-printing machine.

279.    Mr. Barba testified that Brands and Logos does not have a ROQ screen printing machine and does not want one. The court did not find that testimony credible.

280.    Before Mr. Barba left Corvallis Custom, Brands and Logos did not use the Printavo system. Brands and Logos started using the Printavo system after Mr. Barba started working there.

281.    Part of Corvallis Custom's marketing plan involves how to use certain hashtags on social media, combining a mix of popular and less-frequently used hashtags. Mr. Barba made

posts on Brands and Logos Instagram account using the exact same sequence of hashtags that Corvallis Custom had in its marketing plans. For some of those hashtags, the only other company posting and using that hashtag is Corvallis Custom.

282.    On May 14, 2024, Mr. Barba sent the following email to counsel for Corvallis Custom to try to obtain further information about Corvallis Custom's customers:

> John Barba <barba219@gmail.com>                                        Tue, May 14, 2024 at 4:57 PM
> To: Tim Crawley <tcrawley@crawleyllp.com>
>
> Should I be like you and your little fag jesse and wait till the last day to respond? What's crazy is you wasting your time on all this to take a loss and not get anything you hussy - man you dems are crazy lolol I'll address you as they/them for now on.
>
> Motioning for a default hahaha maaaaan yall are funny - suprised the little fag even had the money to pay for this to be filed. Anyways, I don't have any involvement in stealing any customers or their files and that will all come to light here soon - in the meantime make yourself useful and put that list together of what customers, you two losers need to make sure you can provide factual evidence.
>
> Dont worry after you take your sorry ass loss here, you can go try and revive your shitty political career.
> [Quoted text hidden]

283.    On August 6, 2024, the Benton County Circuit Court issued a preliminary injunction prohibiting Brands and Logos, Grace Knowlton, and Mr. Knowlton from soliciting any of Corvallis Custom's customers, with an attached list of 6000-7000 customers filed under seal (a partial list of those customers was provided to this court). The preliminary injunction also prohibited Brands and Logos, Grace Knowlton, and Mr. Knowlton from benefitting from Corvallis Custom's trade secrets, confidential information, and proprietary information taken by Mr. Barba without Corvallis Custom's consent. The Circuit Court issued an oral order on the preliminary injunction in April 2024, but it was not reduced to writing until August. Contrary to Mr. Barba's testimony, this preliminary injunction did not contain any requirement for Mr. Barba to destroy any USB drives (or anything else).

284.    In August 2024, Mr. Barba and Mr. Knowlton approached Ms. Dollar at a trade show. They were seeking better pricing from SanMar—specifically, they wanted the same pricing that Corvallis Custom had with SanMar. Mr. Barba made no effort to explain how he would know Corvallis Custom's pricing with SanMar other than from his work at Corvallis

Custom. Mr. Barba and Mr. Knowlton mentioned to Ms. Dollar the lawsuit between Corvallis Custom and Brands and Logos. Mr. Barba told her that Mr. Freeby was a liar and a thief. The court finds that this is one instance of improper disclosure because Mr. Barba provided information about Corvallis Custom's pricing to Mr. Knowlton and Brands and Logos.

### D. Brands and Logos Fails to Return All .dst Files for Embroidery

285.    After Mr. Barba left Corvallis Custom and it discovered all Mr. Barba's emails and theft, Corvallis Custom refused to pay the remaining balance it owed to Brands and Logos. Brands and Logos sued Corvallis Custom in small claims court to recover this balance.

286.    Corvallis Custom filed a lawsuit against Mr. Knowlton, Brands and Logos, and others (including Mr. Barba) in circuit court. Among other claims, Corvallis Custom brought claims for recovery of the .dst files it had provided to Brands and Logos for embroidery work.

287.    On March 4, 2024, Mr. Knowlton, Brands and Logos, Corvallis Custom, and Mr. Freeby entered into a limited settlement agreement wherein Mr. Knowlton and Brands and Logos agreed to return all of Corvallis Custom's .dst files, and Mr. Freeby and Corvallis Custom agreed to pay Brands and Logos $5,375.18 for unpaid embroidery work and to amend its complaint in circuit court to remove claims relating to the .dst files.

288.    Corvallis Custom made the payment to Brands and Logos. Mr. Knowlton and Brands and Logos did not return 589 of the .dst files to Corvallis Custom.

## XI.    Mr. Barba Threatened Mr. and Ms. Freeby

289.    After Mr. Barba left Corvallis Custom, he threatened to file a wage claim. Mr. Freeby compiled information showing what Corvallis Custom had paid Mr. Barba and sent it to Mr. Barba's attorney. Mr. Freeby never heard back from the attorney, and the attorney did not move forward with a claim.

290.    Shortly after Corvallis Custom won at a state court hearing in approximately October 2024, Mr. Barba posted screenshots of the laser-engraving of a gun on his Instagram account. The gun was engraved with the name of Mr. Barba's personal brand, Born Bad. The word "die" was engraved on the muzzle of the gun. The court finds this was posted to intimidate

Mr. and Ms. Freeby.  Mr. Barba denied that was his gun, but the court did not find that testimony credible.

291.    Mr. Barba also made comments that he would put Mr. Freeby and Corvallis Custom's lawyer into the ground.

292.    In January 2025, at a trade show in Long Beach, California, Mr. Barba and others chased Mr. and Ms. Freeby across a parking lot until a security guard stopped them.

293.    Mr. and Ms. Freeby have obtained a restraining order against Mr. Barba, which prohibits Mr. Barba from having any contact with them outside of court proceedings.

## XII.  Mr. Barba is Actively Hostile to Corvallis Custom and Mr. and Ms. Freeby

294.    Mr. Barba admitted that he claimed he built Corvallis Custom's business.

295.    Mr. Barba has referred to Corvallis Custom as "subpar."  Mr. Barba has made social media posts directed at Corvallis Custom stating that "your whole business [is] trash" and "I built your old business."

296.    Mr. Barba exchanged text messages with Mr. Saboorizadeh about the litigation with Corvallis Custom, in which Mr. Saboorizadeh stated "Get that mf. I wanna see them homeless living under a bridge. You know I'm still on your side on this one so good luck . . ."

297.    In March 2024, Mr. Barba sent a rude text[23] to a group chat that included Mr. Westbrook and a friend of Mr. Barba's who still worked for Corvallis Custom. Mr. Westbrook responded by texting Mr. Barba separately to ask if he had really meant to send it to the group.  Mr. Barba unsent the rude text message.  However, as part of that separate discussion, Mr. Barba and Mr. Westbrook said the following about Corvallis Custom:

> Mr. Westbrook:  "Hahaha got to get her out of there lol.  I'm surprised I haven't been called yet lol"

> Mr. Barba:  "But oh well fuck if we ball" with laughing emojis. "Nah they trynna say I poached you"

---

[23] Both Mr. Barba and Mr. Westbrook testified they did not remember the content of the rude text, which the court did not find credible from either witness.

Mr. Westbrook:  "Exactly bro!!  Can't wait to have you have the license.  Makes my life easier"

Mr. Barba:  "That's why they filed a fake criminal case against me" and "Civil lawsuit and a criminal"

Mr. Westbrook:  "Screw that.  I never liked them anyway.  You're the only reason that I used them" with laughing emojis.

Mr. Barba:  "The criminal case was launched that Thursday you [sic.] said you wasn't fucking with them anymore"

Mr. Westbrook:  "That's hilarious.  If I see anyone try and use them I'm going to tell them not too."

Mr. Barba:  "My man"

298.    At the time of this text exchange, Mr. Westbrook knew that Corvallis Custom was a vendor to Oregon State University.

299.    Although Mr. McCoy is Mr. Westbrook's boss, Mr. McCoy claimed he was not aware of these texts between Mr. Barba and Mr. Westbrook, and dismissed these texts as merely banter between young guys.

300.    In November 2024, Mr. Escanlar sent Mr. Barba a screenshot showing that Mr. Freeby viewed Mr. Escanlar's profile on social media.  Mr. Barba responded, "[b]lock him on everything" and then endorsed Mr. Escanlar on that social media platform.

301.    In December 2024, Mr. Escanlar sent Mr. Barba another screenshot showing a social media post by Corvallis Custom, showing work done for the Oregon State University Kendo club, commenting "[t]he fall off is crazy."  Mr. Barba responded that he was going to trial.  Mr. Escanlar commented "Went from OSU athletics to Kendo club" and Mr. Barba responded with a laughing emoji.

## XIII.   Criminal Charges Against Mr. Barba

302.    On December 13, 2024, the grand jury in Benton County, Oregon, indicted Mr. Barba on 23 criminal counts arising from his actions toward Corvallis Custom.

303.    On July 31, 2025, Mr. Barba pleaded no contest to three of those counts in exchange for the district attorney agreeing to make certain recommendations regarding sentencing and the state dropping the remaining charges.

304.    Mr. Barba was convicted of felony theft in the first degree, felony forgery in the first degree, and misdemeanor theft in the second degree, all relating to acts involving Corvallis Custom.

## XIV.   Mr. Barba Attempts to Tamper with Witnesses

305.    In May 2024, Mr. Barba texted Mr. Westbrook to confirm that he had provided samples for the athletics department at Oregon State University.

306.    Also in May 2024, Mr. Barba asked Mr. Westbrook to provide testimony for him.

307.    On May 28, 2024, Mr. Barba texted Mr. Westbrook to tell him that he had made Mr. Westbrook a hat for his birthday.

308.    Mr. Barba asked Mr. Westbrook to provide him with a document for litigation. Mr. Westbrook testified that he had provided that request to counsel for Oregon State University, who told him not to respond, so he did not.

309.    Mr. Barba and Mr. Escanlar exchanged texts, where Mr. Barba told Mr. Escanlar that Corvallis Custom was accusing Mr. Barba of stealing hats made for ESC.  Mr. Escanlar responded "lol."  Mr. Escanlar testified that he was not totally sure what he was saying when he said "lol," although the court understands this is a commonly used slang term for the phrase "laughing out loud."  Mr. Barba suggested to Mr. Escanlar "Like bro stay lying" in the context of a discussion about whether Mr. Escanlar would be required to testify in court.  Mr. Escanlar responded, "I got pop [Mr. Knowlton's] back too u know that."

310.    In July 2024, Mr. Escanlar and Mr. Barba exchanged further texts, with Mr. Barba stating that "Papi gotta give pops your number he need help with another decleration [sic.]" and "Them losers [referring to Corvallis Custom] keep bringing you in."

XV.    **The Excuses for Mr. Barba's Behavior Were Not Credible**

A.    **Mr. Barba's and Mr. Knowlton's Excuses**

311.    Mr. Knowlton asserted that Corvallis Custom's operating information was well-known publicly and that there is no real secret to operating a screen-printing business.  He said that all producers use the same ideas, tools, and methods.  The court did not find any of this testimony credible, particularly after Mr. Knowlton and Mr. Barba each refused to divulge the identity of the company that converted artwork to vector files for Brands and Logos.  Mr. Barba refused to identify the vendor who does Brands and Logos' vector work, saying it was proprietary information to Brands and Logos' business.

312.    Mr. Knowlton claims that Brands and Logos' current marketing strategy is very different than that used by Corvallis Custom, even though Mr. Barba did a lot of marketing for Corvallis Custom and is now doing the marketing for Brands and Logos.  The court did not find this testimony credible, particularly after social media posts were made for Brands and Logos using exactly the same hashtags that Corvallis Custom used.

313.    Mr. Knowlton and Mr. Barba each claimed that all the free work that Mr. Barba did for Brands and Logos' customers while Mr. Barba was at Corvallis Custom was "in trade" for Brands and Logos willingness to continue to do embroidery work for Corvallis Custom, despite Corvallis Custom's alleged late payment of invoices.  The court did not find any of that testimony credible.  Although Corvallis Custom sometimes was delayed in payment to Brands and Logos, that was because Brands and Logos would email a large batch of invoices at the end of the month, and it took time for Corvallis Custom to link those invoices to specific projects in its Printavo system.  It was a manual process to match those invoices to projects.  Mr. Freeby was not aware of any payment problems with Brands and Logos, nor did he ever authorize the provision of free services to Mr. Knowlton or Brands and Logos.  Ms. Freeby did not recall if Mr. Knowlton ever said he was concerned about Brands and Logos being behind on payment from Corvallis Custom.  Mr. Knowlton never mentioned any intent to sever the relationship between the two companies to Mr. Freeby.

314. Mr. Barba also claimed that the free work he did for Brands and Logos' customers while Mr. Barba was at Corvallis Custom was "in trade" for Brands and Logos willingness to do rush jobs for Corvallis Custom. The court also did not find that testimony credible.

315. Mr. Knowlton and Mr. Barba tried to emphasize the work that Mr. Barba was performing for Mr. Knowlton was after Mr. Barba's work hours at Corvallis Custom, during breaks, or on the weekend. However, Mr. Barba acknowledged that he did this work while on Corvallis Custom's payroll.

316. For the work Mr. Barba did for Brands and Logos while he worked at Corvallis Custom, Mr. Barba claimed that he did that work at home before or after his work hours on his own software. The court did not find that testimony credible. While a few of the email communications between Mr. Barba and Mr. Knowlton about these projects were sent outside Mr. Barba's regular work hours, most were not. Further, these communications were primarily sent to Mr. Barba at his Corvallis Custom email address.

### B. Excuses from Other Witnesses

317. Mr. Westbrook testified that whenever he had Corvallis Custom make a product, it was messed up and had quality issues. However, he could not remember any single mistake that Corvallis Custom had made on any project. No quality issues with product for Mr. Westbrook were ever brought to Mr. Freeby's attention.

318. Mr. McCoy testified that whenever he had Corvallis Custom make a product, it had quality issues. However, he also could not remember any mistake that Corvallis Custom had made on any project.

319. In 2023 and 2024, Oregon State University never requested that Corvallis Custom reprint or refund the price of a product it produced and never complained that a product was produced incorrectly.

320. When Mr. Escanlar testified, he complained about the quality of Corvallis Custom's work, implying this was the reason he moved ESC's embroidery work from Corvallis

Custom to Brands and Logos. The court does not find this credible, given that Mr. Barba was the only person Mr. Escanlar had contact with at Corvallis Custom, Mr. Barba was responsible for the quality of ESC's projects at both Corvallis Custom and Brands and Logos, and Brands and Logos did all the actual embroidery work on ESC's orders.

## XVI.    Additional Facts Relating to Damages

321.    Corvallis Custom's income for 2021 through 2024 was:

| | |
|---|---|
| 2021 | $356,757.57 |
| 2022 | $565,867.42 |
| 2023 | $633,934.24 |
| 2024 | $512,824.86 |

322.    To mitigate the damages caused by Mr. Barba to Corvallis Custom, Corvallis Custom employed Marshall Atkinson, a business consultant with deep experience in the screen-printing industry, to help the company do damage control and recover. Corvallis Custom paid Mr. Atkinson $8,715 for his work.

323.    Mr. Freeby personally spent 10-20 hours per week, on average, during 2024 and up to the time of trial, trying to resolve the problems Mr. Barba created for Corvallis Custom. Employees at Corvallis Custom who bill for hourly time charge $50-$100 per hour. Mr. Freeby bills his time at $100 per hour, which is the rate Corvallis Custom charges for the average employee. Fifteen hours per week, for 52 weeks in 2024 and 44 weeks in 2025, at $100 per hour, is time valued at $144,000.

324.    From 2021 to 2024, Corvallis Custom did the following amount of business with Oregon State University:

| | |
|---|---|
| 2021 | $135,301.21 |
| 2022 | $141,107.71 |
| 2023 | $139,296.95 |
| 2024 | $49,044.57 |

325.    One of Oregon State University's orders in 2023 was a one-time order relating to the opening of Reser Stadium.  Regardless of that fact, Corvallis Custom's level of business with Oregon State University was reasonably consistent from 2021 through 2023.

326.    Other than Mr. Barba's actions, there were no other material factors affecting the relationship between Corvallis Custom and its customers affiliated with Oregon State University.

<u>**Analysis of Claims**</u>

**I.      Corvallis Custom's Claims Against Mr. Barba**

Corvallis Custom asserts that its claims against Mr. Barba are nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A), (a)(2)(B), (a)(4), and (a)(6).  Based on the facts set forth above, Corvallis Custom has proven each of its claims.  Some of Mr. Barba's conduct gives rise to multiple claims under these different subsections of section 523.[24]  Each applicable subsection of section 523(a) is addressed separately below.

**A.      Plaintiff Has Proven its Claim for Fraud Pursuant to 11 U.S.C. § 523(a)(2)(A)**

Corvallis Custom asserts that its claims against Mr. Barba are nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).

**1.      Legal Standard**

Section 523(a)(2)(A) precludes discharge of debt for money, property, or services, to the extent obtained by false pretenses, a false representation, or actual fraud, other than a financial statement.[25]  A creditor must prove five elements to establish this claim: "(1) misrepresentation, fraudulent omission or deceptive conduct by the debtor; (2) knowledge of the falsity or deceptiveness of his statement or conduct; (3) an intent to deceive; (4) justifiable reliance by the

---

[24] As the Supreme Court has recognized, "[t]here is, in short, overlap [among exceptions to discharge], but that overlap appears inevitable." *Husky Intern. Electrs., Inc. v. Ritz*, 578 U.S. 355, 363, 136 S. Ct. 1581, 1588 (2016).
[25] 11 U.S.C. § 523(a)(2)(A).

creditor on the debtor's statement or conduct; and (5) damage to the creditor proximately caused by its reliance on the debtor's statement or conduct."[26]

To prove the first element, there need not be a false representation—fraud includes deception or trickery done intentionally.[27]  A creditor can rely on "actual fraud" which "consists of any deceit, artifice, trick or design involving direct and active operation of the mind, used to circumvent and cheat another—something said, done or omitted with the design of perpetrating what is known to be a cheat or deception."[28]

Failure to disclose a material fact constitutes a fraudulent omission under the first element if the debtor was under a duty to disclose and the omission was motivated by an intent to deceive.[29]  A party has a duty to disclose facts basic to a transaction, if he knows that the other party is about to enter the transaction under mistaken premises, and the other party, because of their relationship, trade customs, or other objective circumstances would reasonably expect disclosure.[30]  In cases involving fraudulent omissions, reliance and causation are established and need not be separately proven.[31]

The plaintiff may rely upon circumstantial evidence to prove the third element.  Intent to deceive is determined under the totality of the circumstances and may be inferred from the facts, including circumstantial evidence.[32]

With respect to the fourth element, the court must look to all the facts and circumstances surrounding the transaction to determine if reliance is justified and "must particularly consider

---

[26] *Turtle Rock Meadows Homeowners Ass'n v. Slyman (In re Slyman)*, 234 F.3d 1081, 1085 (9th Cir. 2000) (internal citations omitted).

[27] *Husky,* 578 U.S. at 359-60, 136 S. Ct. at 1586.

[28] 4 COLLIER ON BANKRUPTCY ¶ 523.08[1][e] (Richard Levin & Henry J. Sommer eds., 16th ed.).

[29] *Harmon v. Kobrin (In re Harmon)*, 250 F.3d 1240, 1246, n.4 (9th Cir. 2001) (citing *Citibank (South Dakota), N.A. v. Eashai (In re Eashai)*, 87 F.3d 1082, 1089-90 (9th Cir. 1996)).  As recognized in *Takazawa v. Higashi (In re Higashi)*, 553 B.R. 153, 159, n.5 (Bankr. D. Haw. 2016), *Husky* implicitly overruled *Eashai* to the extent it limited section 523(a)(2)(A) to common law fraud.  The remaining holdings of *Eashai* remain good law.

[30] *Apte v. Romesh Japra, M.D., F.A.C.C., Inc. (In re Apte)*, 96 F.3d 1319, 1323-24 (9th Cir. 1996).

[31] *Apte*, 96 F.3d at 1323.

[32] *Eashai*, 87 F.3d at 1087; *McCrary v. Barrack, (In re Barrack)*, 217 B.R. 598, 607 (9th Cir. BAP 1998).

the subjective effect of those circumstances upon the creditor."[33]  Justifiable reliance takes into account the "qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases."[34]

In proving the fifth element, plaintiff is not limited to recovering the value of money, property, or services received by the defendant.  "Once it is established that specific money or property has been obtained by fraud, however, 'any debt' arising therefrom is excepted from discharge."[35]  Section 523(a)(2)(A) "prevents the discharge of all liability arising from fraud."[36]  The plaintiff does not need to prove that the defendant received a benefit from the fraud.[37]

## 2.    Analysis

Corvallis Custom has proven that Mr. Barba made misrepresentations, fraudulent omissions, and engaged in deceptive conduct.  The facts show that while Mr. Barba was working for Corvallis Custom, Mr. Barba engaged in a fraudulent scheme involving deceptive conduct to assist Mr. Knowlton and Brands and Logos to benefit himself.  At the time he did this, Mr. Barba knew that Mr. Knowlton and Brands and Logos were acting as direct competitors to Corvallis Custom but he did not disclose that information to Mr. or Ms. Freeby.

Specifically, Mr. Barba did design and consulting work for Mr. Knowlton and Brands and Logos without obtaining payment for that work for Corvallis Custom.  Mr. Barba did some of that work without using the required Printavo system where Corvallis Custom tracked all its projects.  Mr. Barba provided business advice to Mr. Knowlton and Brands and Logos, including providing advice on machines that could be used to create product in competition with Corvallis Custom, providing advice on obtaining licenses needed to compete with Corvallis Custom, and providing a copy of the marketing plan he and his college group did for Corvallis Custom.

---

[33] *Eugene Parks Law Corp. Defined Benefit Pension Plan v. Kirsch (In re Kirsh)*, 973 F.2d 1454, 1460 (9th Cir. 1992).

[34] *Field v. Mans*, 516 U.S. 59, 71, 116 S. Ct. 437, 444 (1995) (quoting Restatement (Second) Torts § 545A, Comment b (1976)).

[35] *Cohen v. de la Cruz*, 523 U.S. 213, 218, 118 S. Ct. 1212, 1216 (1998).

[36] *Cohen*, 523 U.S. at 215, 118 S. Ct. at 1215.

[37] *Ghomeshi v. Sabban (In re Sabban)*, 600 F.3d 1219, 1222 (9th Cir. 2010).

Mr. Barba assisted Mr. Knowlton and Brands and Logos in obtaining new customers, including at least one customer, Camp Attitude, that Corvallis Custom itself was trying hard to obtain. Mr. Barba provided Corvallis Custom's documents to Mr. Knowlton and Brands and Logos, including design artwork Corvallis Custom created for Camp Attitude and agreements with Mr. Saboorizadeh.  Mr. Barba assisted Mr. Knowlton and Brands and Logos with their search engine optimization.  Mr. Barba discussed meeting with a vendor on behalf of Brands and Logos while he was still working for Corvallis Custom.

Mr. Barba affirmatively misrepresented facts to Corvallis Custom when he told Mr. Freeby that he had won a bid from Camp Attitude for Corvallis Custom, but he had actually assisted Brands and Logos in obtaining that customer.  Mr. Barba affirmatively misrepresented facts when he altered Corvallis Custom's records to show false payments on invoices that were not actually made and to reflect obligations to Brands and Logos that were not owed.  Mr. Barba affirmatively misrepresented facts when he altered invoices for his personal projects at Corvallis Custom to include discounts he was not entitled to receive and show payments he did not actually make.

Mr. Barba made fraudulent omissions when he did not tell Mr. and Ms. Freeby that Mr. Knowlton and Brands and Logos were directly competing with Corvallis Custom for work other than embroidery work.  Mr. Barba made fraudulent omissions when he did not tell Mr. and Ms. Freeby that he was assisting Mr. Knowlton and Brands and Logos in their competing business.

Mr. Barba took these actions to assist Mr. Knowlton and Brands and Logos, even though he knew that Corvallis Custom expected him not to engage in any competitive activity or to disclose Corvallis Custom's business information while he worked there—Mr. Barba had signed a contract that prohibited him from engaging in competitive activity and from disclosing Corvallis Custom's business records and confidential information.

Mr. Barba had a duty to disclose to Corvallis Custom and its owners Mr. and Ms. Freeby his competitive activity and his disclosures of confidential information to Mr. Knowlton and Brands and Logos.  It is justifiable for a business to expect that its employees will not compete

directly with it, and to rely on the fact that its employees were not working to compete with the business.  It is also justifiable for a business to expect that its employees will not disclose confidential business information.  This is particularly justifiable for a business that insists that all its employees sign non-compete and nondisclosure agreements.

Mr. Barba also had a duty to Corvallis Custom to handle invoicing honestly, and not to alter invoices to include discounts he was not authorized to make or to reflect non-existent payments and credits.  It is justifiable for a business to expect its employees to behave honestly when creating invoices and applying discounts and payments.

Mr. Barba knew he was behaving deceptively, and he intended to deceive Corvallis Custom.  The facts and circumstances show that Mr. Barba wanted to keep Mr. Knowlton and Brands and Logos as an embroiderer for Corvallis Custom because he earned commissions on embroidered work.  Mr. Barba was personally benefitting from the arrangement—Mr. Knowlton and Brands and Logos were doing personal projects for Mr. Barba and his Born Bad brand and providing him with gifts, such as airline travel.  Mr. Barba knew he was altering invoices.

More importantly, however, Mr. Barba was helping to build up the Brands and Logos business because he wanted to become an owner of Brands and Logos.  In 2023, Mr. Barba came to realize that he was not going to become an owner of Corvallis Custom and decided to leave to become an owner of Brands and Logos instead.  Before leaving Corvallis Custom, he wanted to build up Brands and Logos and take almost everything of value from Corvallis Custom with him so that he could later benefit from it at Brands and Logos.  Mr. Barba did later use information he took from Corvallis Custom after he went to work for Brands and Logos.

Mr. Barba behaved deceptively when he destroyed the USB drive containing files he took from Corvallis Custom, when he asked Mr. Westbrook for testimony around the same time he was providing Mr. Westbrook with gifts, and when he told Mr. Escanlar to "stay lying" in the context of a discussion about whether Mr. Escanlar would be required to testify in court.

Corvallis Custom has proven that it was damaged by Mr. Barba's fraudulent conduct. Because of Mr. Barba, Corvallis Custom provided free work to its competitors Mr. Knowlton and Brands and Logos for which it was not paid.  Because of Mr. Barba, Corvallis Custom lost

work for customers, including Camp Attitude and Keilah Early.  Because of Mr. Barba, Corvallis Custom's confidential information was disclosed to its competitors Mr. Knowlton and Brands and Logos.  All of this was detrimental to Corvallis Custom because that information was later used by Mr. Knowlton and Brands and Logos to provide product to Corvallis Custom's customers, including Oregon State University—work that Corvallis Custom might have otherwise received.  Corvallis Custom incurred costs of dealing with Mr. Barba's fraudulent conduct, including time spent by Mr. Freeby to determine the amount of damage and costs spent on a consultant to help mitigate damage.

This decision addresses the damages under section 523(a)(2) in section I.F. below.[38]

## B.    Plaintiff Has Proven its Claim for Fraud Pursuant to 11 U.S.C. § 523(a)(2)(B)

Corvallis Custom asserts that its claims against Mr. Barba are nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(B).

### 1.    Legal Standard

Section 523(a)(2)(B) precludes discharge of debt for money, property, or services, to the extent obtained by use of a statement in writing that is materially false, respecting the debtor's or an insider's financial condition, on which the creditor reasonably relied, and that the debtor caused to be made or published with an intent to deceive.  A creditor must prove seven elements to establish this claim:  "(1) it provided the debtor with money, property, services, or credit based on a written representation of fact by the debtor as to the debtor's financial condition; (2) the representation was materially false; (3) the debtor knew the representation was false when made; (4) the debtor made the representation with the intention of deceiving the creditor; (5) the creditor relied on the representation; (6) the creditor's reliance was reasonable; and (7) damage proximately resulted from the representation."[39]

---

[38] Because some of the damages are non-dischargeable for more than one reason, this decision addresses damages by category, and describes the reasons for non-dischargeability for each category, in Section I.F. below.

[39] *Stehrenberger v. Stehrenberger (In re Stehrenberger)*, 665 B.R. 402, 418 (9th Cir. BAP 2024) (citing *Grogan v. Garner*, 498 U.S. 279, 286-87, 111 S. Ct. 654, 659 (1991)).

A statement is "respecting" a debtor's financial condition if "it has a direct relation to or impact on the debtor's overall financial status."[40] Analogously, a statement is respecting an insider's financial condition if it has a direct relation to or impact on the insider's overall financial status.

Typically, cases under section 523(a)(2)(B) involve people who obtain credit by including false information on their own financial statement, or the financial statement of a business they own, such as by overvaluing income or assets, or failing to disclose liabilities. To some extent, there can be overlap between section 523(a)(2)(A) and section 523(a)(2)(B).[41]

### 2.    Analysis

This section has limited utility in this case. This case does not involve Mr. Barba borrowing money from Corvallis Custom. Indeed, in this case, Mr. Barba's fraudulent conduct generally falls within the purview of section 523(a)(2)(A). However, as a technical matter, in a very limited way, section 523(a)(2)(B) may apply. Mr. Barba made false statements in writing regarding Corvallis Custom's financial condition when he altered Corvallis Custom's records in the Printavo system to show he paid for product he produced for himself when he had not actually made payment. Mr. Barba knew those statements were false. The statements were material, because Corvallis Custom would not have produced product for Mr. Barba unless he paid for it. Mr. Barba intended to deceive Corvallis Custom when he altered the records because he wanted his goods produced without paying for them. Corvallis Custom reasonably relied on Mr. Barba, its general manager, to follow its requirements regarding employees paying for goods they produced for themselves, and it reasonably relied on information input into the Printavo system to operate its business and produce the goods. Corvallis Custom relied on Mr. Barba's false statements, because after he made the false statements, he was able to proceed to have goods produced for himself. Corvallis Custom was damaged because it was not paid for the goods produced for Mr. Barba.

---

[40] *Lamar, Archer & Cofrin, LLP v. Appling (In re Appling)*, 584 U.S. 709, 720, 138 S. Ct. 1752, 1761 (2018).

[41] *Manion v. Strategic Funding Source, Inc. (In re Manion)*, 667 B.R. 473, 480 (9th Cir. BAP 2025).

To the extent that Mr. Barba was an insider of Corvallis Custom when he was a general manager,[42] section 523(a)(2)(B) would apply to this conduct. While this is not the typical (or even likely the intended) use case for section 523(a)(2)(B), Mr. Barba's conduct technically fits the plain language of the statute. To the extent that Mr. Barba was not an insider of Corvallis Custom, this conduct would be non-dischargeable under section 523(a)(2)(A) for the reasons set forth in section I.A. above.

This decision addresses the damages under section 523(a)(2) in section I.F. below.

### C.    Plaintiff Has Proven its Claim for Embezzlement Pursuant to 11 U.S.C. § 523(a)(4)

Corvallis Custom asserts that its claims against Mr. Barba are nondischargeable pursuant to 11 U.S.C. § 523(a)(4) as embezzlement.

#### 1.    Legal Standard

Section 523(a)(4) precludes discharge of debt for embezzlement. For purposes of section 523(a)(4), embezzlement is defined under federal law, not state law.[43] Embezzlement is defined as "the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come."[44] A creditor must prove three elements to establish this claim: (1) the property is rightfully in the possession of a non-owner, (2) the non-owner's appropriation of the property to a use other than which the property was entrusted, and (3) circumstances indicating fraud.[45]

#### 2.    Analysis

Corvallis Custom has proven that Mr. Barba engaged in embezzlement. As a general manager, Mr. Barba had rightful possession and access to Corvallis Custom's computer files.

---

[42] Insider is defined in 11 U.S.C. § 101, but that section does not specifically address insiders of limited liability companies. Given that Mr. Barba believed that he was doing everything a business owner would do for Corvallis Custom when he was general manager, he may very well have been an insider of Corvallis Custom as a factual matter. The court does not need to decide this question, as the debt would be nondischargeable regardless of whether Mr. Barba was an insider of Corvallis Custom.

[43] *Transamerica Com. Fin. Corp. v. Littleton (In re Littleton)*, 942 F.2d 551, 555 (9th Cir. 1991).

[44] *Id.*

[45] *Id.*

Mr. Barba took Corvallis Custom's computer files, and copied them on to his personal Dropbox, two personal Google drives, an Adobe Creative Cloud drive that Mr. Barba opened in his girlfriend's name, and a USB drive. Mr. Barba was not authorized to use those files by copying them to a location outside of Corvallis Custom's server or to use those files for any purpose other than to conduct business for Corvallis Custom. As set forth in section I.A. above, Mr. Barba took these files so that he could later use them to benefit Brands and Logos, Mr. Knowlton, and ultimately himself. Mr. Barba used some of those files to create products for customers at Brands and Logos, including for Corvallis Custom's customer Oregon State University.

This decision addresses the damages for embezzlement in section I.F. below.

### D.    Plaintiff Has Proven its Claim for Larceny Pursuant to 11 U.S.C. § 523(a)(4)

Corvallis Custom asserts that its claims against Mr. Barba are nondischargeable pursuant to 11 U.S.C. § 523(a)(4) as larceny.

#### 1.    Legal Standard

Section 523(a)(4) precludes discharge of debt for larceny. For purposes of section 523(a)(4), larceny is defined under federal law, not state law.[46] Larceny is "a felonious taking of another's personal property with intent to convert it or deprive the owner of the same."[47] Furthermore, "[f]elonious is defined as 'proceeding from an evil heart or purpose; malicious; villainous ... [w]rongful; (of an act) done without excuse of color of right.'"[48] A creditor must prove three elements to establish this claim: (1) the wrongful taking of the property of another, (2) intent to convert the property to the taker's use or deprive the owner of the property's use, and (3) the property was taken without the consent of the owner.[49]

#### 2.    Analysis

Corvallis Custom has proven that Mr. Barba engaged in larceny. He took product that Corvallis Custom produced for him without paying for it, after altering invoices and payment

---

[46] *Ormsby v. First Am. Title Co. of Nev. (In re Ormsby)*, 591 F.3d 1199, 1205 (9th Cir. 2010).
[47] *Id.*
[48] *Id.*, at 1205, n.4.
[49] *Vans Inc. v. Rosendahl (In re Rosendahl)*, 307 B.R. 199, 216 (Bankr. D. Or. 2004).

records to show that he paid for the items.  Mr. Barba intended to take these items for his own use.  Corvallis Custom did not consent to Mr. Barba taking these items without payment.

After Mr. Barba was no longer employed by Corvallis Custom, he entered Corvallis Custom's premises after hours and removed baseball-style hats, a box, and unknown items placed in his hoodie pocket.  Mr. Barba intended to take these items for his own use.  Corvallis Custom did not consent to Mr. Barba entering or taking these items.

Mr. Barba had no right to take any of these items.  Mr. Barba knew what he was doing, and he knew what he was doing was wrong.  The Ninth Circuit Court of Appeals did not decide in *Ormsby* whether fraudulent intent is necessary to prove larceny.[50]  That makes no difference here, as plaintiff has proven Mr. Barba acted with fraudulent intent.  See section I.A. and I.B. above.

This decision addresses the damages for larceny in section I.F. below.

### E.    Plaintiff Has Proven its Claim for Willful and Malicious Injury Pursuant to 11 U.S.C. § 523(a)(6)

Corvallis Custom asserts that its claims against Mr. Barba are nondischargeable under 11 U.S.C. § 523(a)(6) as willful and malicious injury.

#### 1.    Legal Standard

This section precludes discharge of a debt for willful and malicious injury by the debtor to another entity or to the property of another entity.[51]  A creditor must prove both willfulness and maliciousness to establish this claim.  Willfulness requires that the debtor "has a subjective motive to inflict injury or when the debtor believes that injury is substantially certain to result from his own conduct."[52]  "In addition to what a debtor may admit to knowing, the bankruptcy court may consider circumstantial evidence that tends to establish what the debtor must have actually known when taking the injury-producing action."[53]  Maliciousness requires: (1) a

---

[50] *Ormsby*, 591 F.3d at 1206.

[51] 11 U.S.C. § 523(a)(6).

[52] *Ormsby*, 591 F.3d at 1206.

[53] *Carillo v. Su (In re Su)*, 290 F.3d 1140, 1146 n.6 (9th Cir. 2002).

wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse.[54]

Intentional breach of contract is not sufficient to prove nondischargeability under section 523(a)(6) unless it is accompanied by some form of tortious conduct that gives rise to a malicious and willful injury.[55]  To determine whether there is such tortious conduct, the court must look to state law.[56]

Under Oregon law, a plaintiff may bring a tort claim for breach of the duties of care[57] and loyalty[58] in connection with a breach of contract if there is a special relationship between the parties.[59]  To determine a special relationship, the "focus is not on the subject matter of the relationship, such as one party's financial future; nor is it on whether one party, in fact, relinquished control to the other. The focus instead is on whether the nature of the parties' relationship itself allowed one party to exercise control in the first party's best interests"[60]  Relevant here, an employer may bring a tort claim against an employee for breach of the duty of

---

[54] *Ormsby*, 591 F.3d at 1207, citing *Petralia v. Jercich (In re Jercich)*, 238 F.3d 1202, 1209 (9th Cir. 2001).

[55] *Lockerby v. Sierra*, 535 F.3d 1038, 1040 (9th Cir. 2008); *Jercich*, 238 F.3d at 1206.

[56] *Jercich*, 238 F.3d at 1206.

[57] *Georgetown Realty, Inc. v. Home Ins. Co.*, 313 Or. 97, 110, 831 P.2d 7, 14, n.7 (1992) (en banc)

[58] *Columbia Sportswear Co. v. Ferreira*, No. 3:23-CV-000594-AB, 2025 WL 1520299 (D. Or. May 28, 2025) at *17-18; *Aitkin v. USI Ins. Servs., LLC*, 607 F. Supp. 3d 1126, 1150-51 (D. Or. 2022).

[59] *Georgetown Realty, Inc. v. Home Ins. Co.*, 313 Or. at 106, 831 P.2d at 12.  The Oregon Supreme Court summarized Oregon law as follows: "The lesson to be drawn from this court's cases discussing the choice between contract and tort remedies is this: When the relationship involved is between contracting parties, and the gravamen of the complaint is that one party caused damage to the other by negligently performing its obligations under the contract, then, and even though the relationship between the parties arises out of the contract, the injured party may bring a claim for negligence if the other party is subject to a standard of care independent of the terms of the contract.  If the plaintiff's claim is based solely on a breach of a provision in the contract, which itself spells out the party's obligation, then the remedy normally will be only in contract, with contract measures of damages and contract statutes of limitation. That is so whether the breach of contract was negligent, intentional, or otherwise.  In some situations, a party may be able to rely on either a contract theory or a tort theory or both." *Id.*

[60] *Bennett v. Farmers Ins. Co. of Or.*, 332 Or. 138, 161, 26 P.3d 785, 799 (2001).

loyalty for acts that occur during the employee's period of employment.[61]  An employee has a duty not to actively compete with the employer during the period of employment.[62]  Oregon law recognizes an implied obligation of an employee not to use confidential information of a former employer after leaving employment for personal benefit or to benefit third parties.[63]

Oregon law does not require that a plaintiff prove a special relationship when acts constituting fraud arise from a breach of contract.[64]

A plaintiff may bring a tort claim for violation of the Oregon Uniform Trade Secrets Act[65] notwithstanding the existence of a contract.  By its express terms, the Oregon Uniform Trade Secrets Act does not affect contractual remedies, whether or not based on misappropriation of a trade secret.[66]

### 2.    Analysis

Corvallis Custom has proven that Mr. Barba acted willfully.  When Mr. Barba assisted Mr. Knowlton and Brands and Logos in competing with Corvallis Custom, he must have known that Corvallis Custom was substantially certain to incur an injury as a result—his purpose was to benefit Mr. Knowlton and Brands and Logos, and ultimately himself, at the expense of Corvallis Custom.  When Mr. Barba took computer files from Corvallis Custom, he must have known it would harm Corvallis Custom.  Mr. Barba knew Corvallis Custom wanted that information kept confidential—Mr. Barba signed a contract agreeing to keep that information confidential and agreeing to damages for any improper disclosure.  He necessarily was aware that this information had economic value to Corvallis Custom, and that Corvallis Custom would be harmed if the information were made public or used for purposes other than Corvallis Custom's business.  When Mr. Barba altered records to show that he paid for items that Corvallis Custom

---

[61] *Aitkin*, 607 F. Supp. 3d at 1150.
[62] *Id.*
[63] *McCombs v. McClelland*, 223 Or. 475, 483, 354 P.2d 311, 315 (1960).
[64] *Tigard Sportsurfaces, LLC v. Syntennico, Inc.*, No. CIV. 98-1359-JE, 2000 WL 284189 (D. Or. Mar. 10, 2000).
[65] ORS 646.461 to ORS 646.475.  In the context of describing Arizona's version of the Uniform Trade Secrets Act, the Ninth Circuit Court of Appeals has described claims under that act as tort claims.  *Tracer Rsch. Corp. v. Nat'l Env't Servs. Co.*, 42 F.3d 1292, 1295 (9th Cir. 1994).
[66] ORS 646.473(2)(a).

produced for him when he had not paid for those items, he must have known he was depriving Corvallis Custom of the revenue from those items.  When Mr. Barba entered Corvallis Custom's premises after business hours, when he no longer worked there, to take items he had no authority to take, Mr. Barba must have known that he was harming Corvallis Custom by depriving Corvallis Custom of those items.

The facts and circumstances of this case, taken as a whole, show that Mr. Barba subjectively intended to harm Corvallis Custom.  Mr. Barba's engaged in threatening behavior and was actively hostile toward Mr. and Ms. Freeby.  Mr. Barba even admitted in his trial memorandum that "[e]vidence will show that Defendant had a great deal of personal animus toward Plaintiff's principal."[67]  Mr. Barba wanted to harm Corvallis Custom, because he thought it would benefit Brands and Logos and himself.  Mr. Barba also acted to hide his activity—not informing Mr. Freeby of his actions to aid Mr. Knowlton and Brands and Logos in competing with Corvallis Custom, falsifying business records in Printavo, and taking items from Corvallis Custom after business hours.

Corvallis Custom has also proven that Mr. Barba acted maliciously.  First, Mr. Barba engaged in wrongful acts.  Mr. Barba aided Mr. Knowlton and Brands and Logos in competing with Corvallis Custom.  He did this for his own benefit instead of working for the benefit of Corvallis Custom.  Mr. Barba took products without paying for them.  Mr. Barba altered invoices and payment records so that Corvallis Custom would not receive payment that it should have received.  Mr. Barba took key computer files from Corvallis Custom.  Mr. Barba told one of Corvallis Custom's customers to shut down her website.  Mr. Barba was criminally convicted for taking goods from Corvallis Custom.

Second, Mr. Barba acted intentionally.  Mr. Barba knew what he was doing.  He was acting to benefit himself at the expense of Corvallis Custom.

Third, Mr. Barba's acts necessarily injured Corvallis Custom.  Corvallis Custom's business did suffer losses and damage.  When Mr. Barba took products without paying for them,

---

[67] Defendant's Trial Memorandum, ECF No. 65, filed Sept. 30, 2025, p. 6.

Corvallis Custom did not receive revenue.  When Mr. Barba aided Mr. Knowlton and Brands and Logos, Corvallis Custom's resources were used but it received no benefit.  When Mr. Barba took key computer files from Corvallis Custom, the information in those files became subject to the risk of exposure and use for purposes outside of Corvallis Custom's best interests.

Finally, Mr. Barba had no just cause or excuse to take these actions.  The mere fact that Mr. Barba wanted a raise and an ownership interest, but did not receive them, is not appropriate justifications for his actions.  Mr. Barba's other excuses were not credible.

Mr. Barba intentionally breached his Nondisclosure Agreement and Non-Compete agreement with Corvallis Custom while he was an employee of Corvallis Custom.  Those breaches of contract were accompanied by tortious behavior, while Mr. Barba was in a special relationship with Corvallis Custom.  Mr. Barba had a special relationship to Corvallis Custom when he was employed by Corvallis Custom.  When Corvallis Custom employed Mr. Barba as a general manager, it allowed Mr. Barba to exercise control in Corvallis Custom's best interest.  Even Mr. Barba himself described his role as general manager as running the business and doing everything a business owner should do.  Mr. Barba had a duty to act with care and loyalty toward Corvallis Custom.  Mr. Barba breached that duty.

Mr. Barba misappropriated trade secrets under Oregon law.  Under the Oregon Uniform Trade Secrets Act, misappropriation of a trade secret includes acquisition of the trade secret by improper means.[68]  Improper means includes obtaining a trade secret by breach of a duty to maintain secrecy.[69]  Mr. Barba had an express contractual duty under his Nondisclosure Agreement to maintain Corvallis Custom's confidential information in the strictest confidence for the sole and exclusive benefit of Corvallis Custom, and not to copy that information or use that information for his own benefit.  When Mr. Barba copied Corvallis Custom's computer files to his personal Dropbox, two personal Google drives, an Adobe Creative Cloud drive that Mr. Barba opened in his girlfriend's name, and his USB drive, Mr. Barba misappropriated Corvallis Custom's trade secrets.  Corvallis Custom is not required to show that Mr. Barba used

---

[68] ORS 646.461(2)(a).
[69] ORS 646.461(1).

those computer files[70] (although the facts show that he did use some of the files, including for preparation of shirts for the Oregon State University women's basketball team for the Maui Classic).

As part of Mr. Barba's motion for judgment as a matter of law at the conclusion of Corvallis Custom's presentation of evidence, Mr. Barba's counsel argued that any claims relating to the tort of conversion under section 523(a)(6) should be disregarded because the Oregon Uniform Trade Secrets Act supersedes conflicting Oregon tort law,[71] and Corvallis Custom's claim relied upon the tort of conversion. Corvallis Custom's complaint should not be read so narrowly.

In its complaint, Corvallis Custom alleged that Mr. Barba had contractual obligations to Corvallis Custom under his Nondisclosure Agreement and Non-Compete.[72] Corvallis Custom incorporated those allegations into its claim under section 523(a)(6), and further alleged that Mr. Barba willfully and maliciously injured Corvallis Custom when he "wrongfully converted Corvallis Custom's property, including but not limited to Corvallis Custom's internal and proprietary information, procedures, marketing methods, trade secrets, customer lists, and business practices, as well as wages and Corvallis Custom merchandise and print resources" and that he did so "intending to harm Corvallis Custom and its interests as it sought to undermine its competition with Corvallis Custom, infiltrating it from within while holding a position of trust and agency with Corvallis Custom."[73]

Corvallis Custom clearly pleaded contract obligations, as well as facts that Mr. Barba disclosed confidential information and competed with Corvallis Custom while holding a position of trust and agency. This was sufficient to plead broader tort claims of the breach of Mr. Barba's duty of care and loyalty to Corvallis Custom in connection with breach of Mr. Barba's contracts

---

[70] *Columbia Sportswear*, 2025 WL 1520299, at *8.
[71] Defendant's Memorandum in Support of Motion for Judgment as a Matter of Law, ECF No. 114, filed Oct. 22, 2025, pp. 5-7.
[72] Amended Adversary Complaint, ECF No. 19, filed Dec. 3, 2024, p. 2.
[73] Amended Adversary Complaint, ECF No. 19, filed Dec. 3, 2024, pp. 12-13.

with Corvallis Custom, and that he misappropriated trade secrets, to the extent that establishment of those claims would be necessary to prove willful and malicious injury.

Mr. Barba intentionally breached the Nondisclosure Agreement and the Non-Compete agreement. His breaches of the Nondisclosure Agreement were accompanied by embezzlement, fraud, and misappropriation under the Oregon Uniform Trade Secrets Act. Mr. Barba's breaches of the Non-Compete agreement were accompanied by fraud. Corvallis Custom has established a claim for willful and malicious injury based on intentional breach of contract accompanied by tortious conduct.

This decision addresses the damages for willful and malicious injury in section I.F. below.

### F.    Damages

The nature of the harm to Corvallis Custom includes both economic losses as well as intangible losses to Corvallis Custom's reputation and business. There are two ways damages can be established in this case. One is to consider actual damages. The other is to rely on the undisputed agreements between the parties. The court concludes that, to the extent an agreement of the parties is applicable, the court will use the agreement to calculate damages. For other categories of damages not covered by an agreement, the court will rely upon actual damages.

The total amount of damages Corvallis Custom is entitled to recover in this case is $897,235.41, calculated as set forth below.

### 1.    Damages Arising From Mr. Barba's Competition with Corvallis Custom While Working for Corvallis Custom

The Non-Compete agreement addresses damages for competition by Mr. Barba while working for Corvallis Custom. The damages for each instance of competition under the Non-Compete are $5,000. Mr. Barba engaged in at least 67 individual instances of competition to aid Brands and Logos, Mr. Knowlton, and himself when he was working for Corvallis Custom. The total amount of damages Mr. Barba owes Corvallis Custom for instances of competition is $335,000 (67 multiplied by $5,000).

This entire amount is non-dischargeable under section 523(a)(2)(A) as part of Mr. Barba's fraud and under section 523(a)(6) as part of Mr. Barba's willful and malicious injury to Corvallis Custom.

### 2.    Damages Arising From Mr. Barba's Improper Disclosure of Corvallis Custom's Information

The Non-Disclosure Agreement addresses damages for improper disclosures made by Mr. Barba.  The damages for each instance of improper disclosure under the Non-Disclosure Agreement are $5,000.  Mr. Barba engaged in at least 78 individual instances of improper disclosure of Corvallis Custom's information.  The total amount of damages Mr. Barba owes Corvallis Custom for instances of improper disclosure is $390,000 (78 multiplied by $5,000).

This entire amount is non-dischargeable under section 523(a)(2)(A) as part of Mr. Barba's fraud, and under section 523(a)(6) as part of Mr. Barba's willful and malicious injury to Corvallis Custom.

To the extent these improper disclosures involved Mr. Barba taking Corvallis Custom's computer files before he left Corvallis Custom, a portion of these damages is also non-dischargeable under section 523(a)(4) as embezzlement.  Of the 78 total instances of improper disclosure, 71 of the instances were for Mr. Barba taking Corvallis Custom's computer files before he left Corvallis Custom.  Therefore, $355,000 (71 multiplied by $5,000) of this amount is also non-dischargeable as embezzlement.

### 3.    Damages for Mr. Barba Taking Product from Corvallis Custom Without Payment

Mr. Barba made, but did not pay for, $19,420.41 of product for himself or to promote his personal projects.  This amount is non-dischargeable under section 523(a)(4) as larceny and under section 523(a)(6) as willful and malicious injury.  Because Mr. Barba altered Corvallis Custom's business records to acquire these goods without paying for them, this amount is also non-dischargeable under section 523(a)(2) as fraud.[74]

---

[74] The court need not address whether this entire amount is non-dischargeable under section 523(a)(2)(A) or whether some portion of this is non-dischargeable under section 523(a)(2)(B) to

Mr. Barba argues that this amount of Corvallis Custom's damages should be limited to $14,548.15, which is the amount he asserts he was obligated to pay to Corvallis Custom in restitution after he was criminally convicted. This argument lacks merit. Under Oregon law, the amount awarded in restitution does not limit the damages that can be awarded in a subsequent civil case. Oregon's restitution statute provides that "[n]o finding made by the court or failure of the court to make a finding under this section limits or impairs the rights of a person injured to sue and recover damages in a civil action as provided in ORS 137.109."[75]

### 4.    Damages for Mr. Barba Taking Property from Corvallis Custom

Mr. Barba entered Corvallis Custom's premises after business hours and took property from Corvallis Custom, including baseball style hats, a box, and items he put in his hoodie pocket. Mr. Barba was convicted of theft in the second degree for this behavior, and specifically, for theft of merchandise with a value of $100 or more. In the absence of additional evidence of the value of the items taken, the court finds that the damages are $100. This amount is non-dischargeable under section 523(a)(4) as larceny and under section 523(a)(6) as willful and malicious injury.

### 5.    Costs of Mitigating Damage Mr. Barba Caused

Corvallis Custom incurred costs of $8,715 to its business consultant Mr. Atkinson, and costs of $144,000 worth of Mr. Freeby's time, to identify Mr. Barba's fraudulent behavior and mitigate the losses Mr. Barba willfully and maliciously caused to Corvallis Custom.

These amounts are non-dischargeable under section 523(a)(2)(A) as part of Mr. Barba's fraud and under section 523(a)(6) as part of Mr. Barba's willful and malicious injury to Corvallis Custom.

---

the extent that Mr. Barba was an insider of Corvallis Custom. Either way, it is all non-dischargeable under section 523(a)(2).

[75] ORS 137.106(4). Indeed, evidence showing the amount of a restitution award cannot even be presented in a subsequent civil case, ORS 137.109(1), and this court did not allow admission of that evidence.

II.    **Mr. Barba's Affirmative Defenses**

In his answer, Mr. Barba asserted six affirmative defenses.  Mr. Barba proved one of those affirmative defenses in part and has not proven the remainder of his affirmative defenses. Each of Mr. Barba's affirmative defenses is addressed separately below.

**A.  Defendant Has Not Proven his Affirmative Defense of Failure to State a Claim**

Mr. Barba alleged that Corvallis Custom failed to state a claim upon which relief can be granted.[76]  For the reasons set forth above, Corvallis Custom has stated and proven its claims under 11 U.S.C. §§ 523(a)(2)(A), (a)(2)(B), (a)(4), and (a)(6).  This affirmative defense lacks merit.

**B.    Defendant Has Proven his Affirmative Defense of Illegality in Part and Not Proven it in Part**

**1.    The Non-Compete Agreement is Enforceable to the Extent it Prohibited Mr. Barba from Competing Against Corvallis Custom While He Worked for Corvallis Custom**

Mr. Barba alleged that the Non-Compete Agreement is not enforceable.[77]  Under ORS 653.295(1), a noncompetition agreement is voidable and may not be enforced if certain requirements of that statute are not met.  There is no dispute that the requirements of the statute were not met.  The question here is whether the Non-Compete agreement between Corvallis Custom and Mr. Barba is a noncompetition agreement for purposes of ORS 653.295.

Oregon law defines "noncompetition agreement" for purposes of former ORS 653.295 as "an agreement, written or oral, express or implied, between an employer and employee under which the employee agrees that the employee, either alone or as an employee of another person, will not compete with the employer in providing products, processes or services that are similar to the employer's products, processes or services for a period of time or within a specified geographic area ***after termination of employment***."[78]  Nothing in this statute prohibits an

---

[76] Answer and Affirmative Defenses, ECF No. 20, filed Dec. 18, 2024, p. 4.

[77] Answer and Affirmative Defenses, ECF No. 20, filed Dec. 18, 2024, p. 4.

[78] Former ORS 653.295(7)(d) (emphasis added).  In this decision, the court is relying upon the version of ORS 653.295 which was in effect in 2019 when the parties entered into the

employer from entering into an agreement with an employee requiring that the employee will not compete with the employer during the employee's time of employment. Indeed, such an agreement would be consistent with public policy because an employee has a duty not to engage in competition with the employer while employed.[79]

The Non-Compete agreement between Corvallis Custom and Mr. Barba provides that Mr. Barba "shall not directly or indirectly engage in, or have any interest in any corporation, partnership, limited liability company, association, joint venture, or other entity that engages in, any "Competitive Activity," as defined in this section *during the employment period and for a period of 2 years after the date of last employment* with [Corvallis Custom]."[80] The Non-Compete also provides "If any provision of this Agreement is invalid or unenforceable in any respect for any reason, the validity and enforceability of such provision in any other respect and of the remaining provisions of this Agreement will not be in any way [im]paired [sic]."[81]

Oregon law allows the partial enforcement of a noncompetition agreement to the extent that agreement is lawful.[82] This is particularly true where there is a severability clause in the contract.[83] The words "and for a period of 2 years after the date of last employment" can easily be excised from the Non-Compete, leaving the remainder of the agreement enforceable. Therefore, Corvallis Custom can enforce the Non-Compete agreement to the extent that breaches of that agreement occurred while Mr. Barba worked for Corvallis Custom.

None of the damages awarded in this case based specifically on the Non-Compete agreement arise from Mr. Barba's competition with Corvallis Custom after he left Corvallis Custom.

---

Non-Compete agreement. However the differences between current ORS 653.295 and former 653.295 are not material to this case.

[79] *Aitkin*, 607 F. Supp. 3d at 1150.
[80] ECF No. 90, Exh. 2, filed Oct. 9, 2025 (emphasis added).
[81] ECF No. 90, Exh. 2, filed Oct. 9, 2025.
[82] *Oregon Psychiatric Partners, LLP v. Henry*, 293 Or. App. 471, 481-82, 429 P.3d 399, 405-06 (2018) (allowing enforcement of non-solicitation provisions where other parts of noncompetition agreement were unenforceable).
[83] *Id.*

## 2.    The Damages Provisions in the Non-Compete and the Nondisclosure Agreement are Enforceable

Mr. Barba did not specifically challenge the enforceability of the damages provisions in the Non-Compete and the Nondisclosure Agreement.[84]  The party opposing the use of a liquidated damages provision has the burden of proving that the challenged provision is unlawful.[85]  Nonetheless, because the determination of damages in this case relies in part on the damage provisions in the Non-Compete agreement and the Nondisclosure Agreement, the court considered whether these specific provisions were lawful under Oregon law.

The District Court in Oregon has recently succinctly summarized Oregon law on liquidated damages provisions as follows:

> Oregon courts use a two-part inquiry to determine whether a contract provision is an unlawful liquidated damages clause.  First, the court must determine whether the disputed clause is actually a liquidated damages clause.  Then, it must determine whether the liquidated damages provision is an unlawful penalty.
>
> A liquidated damages provision gives the nonbreaching party the right to recover an agreed sum of money in the event of a breach. Where a contract involves a liquidated damages provision, the Court applies three criteria to determine whether that provision is lawful.  The agreed sum must be reasonable considering: (1) the anticipated or actual harm caused by the breach; (2) the difficulties of proof of loss; and (3) the inconvenience or nonfeasibility of otherwise obtaining an adequate remedy.  A contract provision for liquidated damages will not be declared to be a penalty because the

---

[84] Mr. Barba did challenge the use of a liquidated damages provision to establish the amount of the debt that would be non-dischargeable, relying upon *Wish Acquisition, LLC v. Salvino (In re Salvino)*, 373 B.R. 578 (Bankr. N.D. Ill. 2007), *aff'd sub nom. Wish Acquisition, LLC v. Salvino*, No. 07C4756, 2008 WL 182241 (N.D. Ill. Jan. 18, 2008).  *Salvino* is distinguishable from this case.  The bankruptcy court in Illinois found as a matter of fact that Mr. Salvino's breach of contract was not tortious and stated in dicta that the debt resulting from a tortious breach of contract is only nondischargeable to the extent tort law so provides.  Here, this court reaches the opposite conclusion—this court finds that Mr. Barba's breaches of contract were tortious.  Any debt arising from those torts is non-dischargeable.  See Section I.A.1. above (any debt arising from fraud is non-dischargeable under section 523(a)(2)(A)).  This court sees no reason why the rule should be different for damages arising under section 523(a)(4) or 523(a)(6).

[85] *Dean Vincent, Inc. v. McDonough*, 281 Or. 239, 249, 574 P.2d 1095, 1101 (1978), disapproved of on other grounds by *DiTommaso Realty, Inc. v. Moak Motorcycles, Inc.*, 309 Or. 190, 194, 785 P.2d 343, 345 (1990).

> stipulated amount to be paid as damages is more than the amount
> of the actual damages unless the stipulated amount is grossly
> disproportionate, or has no reasonable relation to the probable loss,
> as anticipated at the time of the contract.  A term fixing an
> unreasonably large liquidated damages is void as a penalty.[86]

Because the Non-Compete agreement and the Nondisclosure Agreement give Corvallis Custom the right to recover $5,000 for each instance of breach of contract, these contracts contain liquidated damages clauses.

The liquidated damages clauses in the Non-Compete agreement and Nondisclosure Agreement are not unlawful penalties.  After considering all the facts of this case, including the harm that Corvallis Custom reasonably feared could happen if its employees competed with it and shared its confidential business information, the difficulties in proving harm to Corvallis Custom's reputation in the industry and business relationships with its customers, and the difficulties in proving actual damages for all components of the harm Corvallis Custom suffered, the court concludes that the contractual liquidated damages of $5,000 per breach is a reasonable amount.  The reason the damages are so high in this case is not because the liquidated damages provisions are unreasonable, but because Mr. Barba violated the Nondisclosure Agreement and Non-Compete agreement so many times.

The amount of damages the court calculated pursuant to the liquidated damages clauses is not grossly disproportionate to the loss in income, and related loss in business with one of its most important customers, that Corvallis Custom suffered just in the first year after Mr. Barba committed his fraud and willful and malicious injury.  It is reasonable to believe the pervasiveness of Mr. Barba's misconduct may have lasting effect on Corvallis Custom's business.  The evidence showed that some large customers, such as Oregon State University and Camp Attitude, make substantial orders every year for some of their events.  When Mr. Barba diverted business from Corvallis Custom to Brands and Logos for large customers like this, he caused Corvallis Custom to lose not just current business from these customers, but the opportunity for future business from them.

---

[86] *Columbia Sportswear*, 2025 WL 1520299, at *15 (citation modified/cleaned up).

### 3.    Defendant Has Not Proven his Affirmative Defense of Failure to Form a Contract

Mr. Barba alleged that the Non-Compete agreement was not enforceable because Corvallis Custom provided no consideration to him.[87]  Mr. Barba did not prove this affirmative defense.  Mr. Barba signed the Non-Compete agreement at the commencement of his employment.  Corvallis Custom made it clear that Mr. Barba was required to sign the Non-Compete agreement before he could work for Corvallis Custom.  By signing the Non-Compete agreement, Mr. Barba received the benefit of future employment with Corvallis Custom.  This is sufficient consideration under Oregon law.[88]

### 4.    Defendant Has Not Proven his Affirmative Defense of Failure to Mitigate

Mr. Barba alleged that Corvallis Custom failed to mitigate its damages.  A plaintiff is generally obligated to mitigate its damages.[89]  In this case, Corvallis Custom made reasonable efforts to mitigate its damages.  Corvallis Custom did a thorough investigation to determine the extent of damage Mr. Barba caused to its business.  Corvallis Custom hired Marshall Atkinson to help it find ways to recover from the losses Mr. Barba caused.  Corvallis Custom pursued and obtained a preliminary injunction to stop future inappropriate use of its confidential information and solicitation of its customers.  Defendant has provided no evidence of any action it believes Corvallis Custom should have taken to mitigate its damages but did not take.  Mr. Barba failed to prove this affirmative defense.

---

[87] Answer and Affirmative Defenses, ECF No. 20, filed Dec. 18, 2024, p. 4.

[88] *McCombs*, 223 Or. at 480, 354 P.2d at 314 ("Had defendant signed the [noncompetition] agreement at the time she first became employed, no problem regarding consideration would arise, as a benefit would accrue to her by reason of obtaining employment."); *Bouska v. Wright*, 49 Or. App. 763, 768, 621 P.2d 69, 72 (1980) (finding sufficient contemporaneous consideration to enforce non-competition clause in employment agreement where parties entered into agreement within 3 days of employee starting employment).

[89] *Enco, Inc. v. F.C. Russell Co.*, 210 Or. 324, 339, 311 P.2d 737, 744-45 (1957).

### 5.    Defendant Has Not Proven his Affirmative Defense of Fault of Others

Mr. Barba alleged that Corvallis Custom's damages were the result of the fault of others, including Corvallis Custom.[90]  This affirmative defense has no applicability here.  Oregon law does not require the comparison of fault for intentional torts.[91]  Moreover, Mr. Barba did not prove facts suggesting that Corvallis Custom was at fault for its own damages.

### 6.    Defendant Has Not Proven his Affirmative Defense of Plaintiff's Disclosure of Trade Secrets

Mr. Barba alleged that Corvallis Custom voluntarily disclosed information it alleges are trade secrets to the general public.[92]  Mr. Barba did not prove facts sufficient to support this affirmative defense.

### Conclusion

For the reasons set forth above, the court concludes that defendant's total debt to plaintiff is $897,235.41.  Of this total amount, $897,135.41 is not dischargeable pursuant to 11 U.S.C. § 523(a)(2), $355,000 is not dischargeable pursuant to 11 U.S.C. § 523(a)(4) for embezzlement, and $19,520.41 is not dischargeable pursuant to 11 U.S.C. § 523(a)(4) for larceny.  The entire amount is not dischargeable pursuant to 11 U.S.C. § 523(a)(6) for willful and malicious injury. This court will enter judgment in favor of plaintiff accordingly on its claims.

### # # #

---

[90] Answer and Affirmative Defenses, ECF No. 20, filed Dec. 18, 2024, p. 4.
[91] *Shin v. Sunriver Preparatory Sch., Inc.*, 199 Or. App. 352, 372-78, 111 P.3d 762, 774-78 (2005).
[92] Answer and Affirmative Defenses, ECF No. 20, filed Dec. 18, 2024, p. 5.